## MERCHANTS' NAT. BANK OF BALTIMORE v. ROXBURY DISTILLING CO.

(District Court, D. Maryland. March 25, 1912.)

1. WAREHOUSEMEN (§ 15*)—DISTILLERY WAREHOUSE RECEIPTS—NEGOTIABILITY AND TRANSFER.

Distillery warehouse receipts represent the property, and under the statutes of Maryland, which expressly make them negotiable instruments, as well as by the general commercial law, their transfer in the usual course of business by way of sale or pledge operates as a delivery of the property therein described.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 31–34, 37; Dec. Dig. § 15.*]

2. WAREHOUSEMEN (§ 15*)—DISTILLERY WAREHOUSE RECEIPTS—RIGHTS OF PLEDGEES.

Certain distillery warehouse receipts were pledged to secure personal loans made to the president of the distilling company. A law of the state which took effect before some of the assignments made such receipts negotiable instruments, and it appeared that prior to that time the business of the company had been conducted on account of the president, who had then transferred it to the company together with all the whisky in store, and that such pledges as were made by him afterward were to secure renewals of his former indebtedness or for new loans with which to take up the old ones. Also, that he was the owner of practically all of the stock of the company and personally conducted its business without objection on the part of its directors. *Held*, that under such facts the pledgees took good title to the whisky represented by the receipts as against the creditors of the company.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 31–34, 37; Dec. Dig. § 15.*].

3. WAREHOUSEMEN (§ 15*)—DISTILLERY WAREHOUSE RECEIPTS—PRIORITY AS BETWEEN PLEDGEES—DUPLICATE RECEIPTS.

Where warehouse certificates pledged by a distillery company were in some cases canceled and others for the same barrels, but in smaller lots, substituted therefor, for convenience in selling, there was no release of the lien which continued from the date of the original certificates and took precedence over that of duplicate certificates for the same whisky, subsequently issued and pledged to others; the latter receipts being effective, however, to create second liens as against general creditors.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. §§ 31–34, 37; Dec. Dig. § 15.*]

4. TAXATION (§ 507*)—LIEN FOR TAXES—MARYLAND TAX ON DISTILLED SPIRITS.

Under Act Md. 1892, c. 704 (Code Md. art. 81, § 214), which imposes a county tax on distilled spirits in bond, requiring the distillery to make stated reports and to pay such taxes, for which it is given a lien on the spirits, as construed by the Maryland Court of Appeals, a county has no lien on whisky owned by a distillery for the tax due on other whisky on storage in its warehouse which has been sold or transferred to others, because of its failure to pay such tax, in which capacity it acts merely as collector for the county.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 937–941; Dec. Dig. § 507.*]

5. BILLS AND NOTES (§ 534*)—PROVISION FOR ATTORNEY'S FEES—CONSTRUCTION.

Where a note secured by a pledge of whisky in bond contained a provision that on default the holder might sell the collateral and apply the proceeds to the payment of the note with all costs and attorney's fees, on a sale of the whisky by receivers for the pledgor, leaving nothing for

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the holder of the note to do except to prove its claim, it was not entitled to costs or attorney's fees.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1946, 1947; Dec. Dig. § 534.*]

In Equity. Suit by Merchants' National Bank of Baltimore against the Roxbury Distilling Company. On exceptions to report of John Hinkley, Special Master. Exceptions overruled and report confirmed.

The following is the opinion of John Hinkley, Special Master:

The Roxbury Distilling Company is a body corporate, duly incorporated under the laws of the state of West Virginia by charter dated May 9, 1900, and expiring May 15, 1920. At the time of its incorporation and until the appointment of receivers on February 21, 1910, it conducted a distillery in Washington county, Md., having a complete distillery plant and several bonded warehouses for the storage of whisky distilled by the company, pending the payment of the internal revenue tax of $1.10 per gallon and the withdrawal of the whisky. The president of the company and the active manager of the business was George T. Gambrill, who was largely interested as a stockholder of the company. The original capitalization of the company was $100,000, divided into 1,000 shares of $100 each, of which George T. Gambrill owned 960 shares. On June 16, 1904, the company was reorganized and the capital increased to $400,000 preferred stock and $200,000 common stock; $300,000 of the preferred stock and all of the common stock except the qualifying shares of directors being owned by Gambrill. In April, 1906, the capitalization was increased by the addition of $400,000 of preferred stock and $200,-000 of common stock, so that the capital stock thereafter consisted of $800,000 of preferred stock divided into 8,000 shares of the par value of $100 a share, and $400,000 of common stock divided into 4,000 shares of the par value of $100 a share.

Prior to June 19, 1906, the operations of the distillery were carried on for account of Gambrill, he paying and receiving credit for the expenses, and the whisky produced being billed to him and placed in the bonded warehouses of the company for his account. On June 19, 1906, in accordance with an offer, dated June 12, 1906, from Gambrill submitted to a committee of the directors and ratified by the directors and stockholders, Gambrill sold to the company certain property, including all his whisky on storage, for the sum of $607,-678.18; the consideration being payable $200,000 in common stock at par and $407,678.18 in cash, to be realized by the sale of the company's new preferred stock. The $200,000 of common stock was used largely as a bonus to purchasers of the preferred stock. The property assigned from Gambrill to the Company consisted of 13,363 barrels of whisky in bond, a quantity of free whisky—that is, whisky on which the tax had been paid—certain packing and labeling materials, bottling plant, etc., accounts receivable to the amount of $51,-190.94 and the good will of the selling business previously conducted by Gambrill under the name of the Roxbury Rye Distributing Company. There is also included in the total an advertising account of $10,923.89 and sundry smaller items of expense account.

On June 19, 1906, an assignment, including in general terms the property sold, was executed by Gambrill to the Roxbury Distilling Company, and on or shortly prior to that date, journal entries were made crediting his account with $407,672.18. This sum so credited was thereafter paid in installments to Gambrill by cash payments, assumption of his notes, or merchandise debits, until in February, 1910, his account showed a debit balance against him of $8,607.35, which he attempted to offset by an unauthorized credit made by him on February 15, 1910, of salary from July 1, 1906, to March 1, 1910, at $15,000 a year.

A considerable quantity of the whisky sold by Gambrill to the company had been previously hypothecated by him to secure his notes. Some of these notes were assumed or paid by the company and charged from time to time against his account. Many of them, however, are still unpaid, and storage receipts

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for some of the same barrels sold by him to the company are still outstanding in the hands of his creditors.

On January 1, 1908, the Roxbury Distilling Company executed a mortgage of its property in Washington county, Md., to the Carnegie Trust Company to secure an issue of $350,000, 6 per cent. bonds, of which bonds $349,000 have been issued and are outstanding and appear to be held entirely by pledgees as security for loans.

On February 21, 1910, the present proceeding was instituted by the Merchants' National Bank, a large creditor of the company, and on the same day Charles A. Webb and Sullivan Pitts were appointed receivers of the company.

On February 25, 1910, S. Johnson Poe was appointed co-receiver, and on March 1, 1910, an order was passed giving notice to creditors to file their claims on or before June 1, 1910.

During the course of the operations of the company certificates purporting on their face to be storage warehouse receipts were issued by the Roxbury Distilling Company and certain barrels of whisky designated by the government serial numbers were therein designated as being held on storage for account of the holders of the certificates. Some of these certificates were issued to outright purchasers of whisky, who bought from Gambrill or from the company, some were pledged as security for money borrowed by the Roxbury Distilling Company, and some were issued to Gambrill and pledged by him to secure loans made to him. The receivers' report, filed March 29, 1910, shows that they found stored in the bonded warehouses of the company 17,825 barrels of whisky and 1,301 half barrels, making a total of 19,126 packages. Of this, the report states that there were sold by Gambrill to other persons before the sale of the whisky business to the Roxbury Distilling Company in the year 1906, but still remaining on storage in the bonded warehouses, 615 barrels and 1,125 half barrels, making 1,740 packages, and leaving 17,386 packages which had not been so sold. It was discovered that there had been considerable duplication of these storage warehouse receipts. That is to say, receipts had been issued to different parties for the same barrels of whisky; in a great many cases two receipts having been issued; in some cases three; occasionally four; and in one instance five. The receivers' report states the extent of this duplication to be as follows:

Of the 17,386 packages of whisky of the company, two sets of receipts have been issued on 10,592 packages, three receipts on 4,145 of the duplicated packages, 4 receipts on 1,158 of the triplicated packages, and a fifth receipt for 3 quadruplicated packages. These figures will probably not be modified substantially by a careful analysis of the testimony now before the Master.

This gross fraud had continued for a number of years, and large sums of money were obtained from banks, trust companies, and other innocent holders upon the faith of the pledging of these certificates as collateral for loans.

A sale of the large bulk of whisky which came into the hands of the receivers has been made by them and ratified by the court and the purchase money paid; the whisky remaining in the bonded warehouses subject to payment of tax and withdrawal from time to time at the pleasure of the purchasers. So far as possible, the whisky sold to outright purchasers was not included in the sale, but was reserved for the benefit of such purchasers subject to the final decision of the question of the validity of the receipts. A number of these purchasers applied to the court by petition, and in most cases an order of court was passed authorizing the receivers to deliver the whisky to them upon their filing a bond to refund the value thereof in case the decision should be adverse.

The real estate, machinery, fixtures, tools, and trade-marks covered by the mortgage have not yet been sold, but have been advertised by the receivers for sale on May 31, 1911.

On March 27 and 28, 1911, the question of the validity of the warehouse receipts was argued before me by the holders and pledgees of such receipts, and the contention was made by certain creditors holding duplicated receipts that the receipts were invalid as passing title to the goods in the warehouse of an insolvent distiller. The questions relating to the determination of the priorities of the various holders of duplicated receipts were argued before me on April 10, 13, and 17, 1911, and are now also to be determined.

#### Characteristics of Bonded Distillery Warehouses, Federal Statutes, and Testimony.

The object of the bonded distillery warehouse is to enable the distiller to keep the spirits distilled by him in storage until they have the requisite age for consumption, deferring the payment of the government tax during this period, and the rights of the government being protected by the complete supervision of the process of distillation and control over the product until the tax has been paid. The provisions of the Federal Statutes are contained in sections 3247 to 3334, title "Internal Revenue," subtitle "Distilled Spirits," which will be found at 3 Federal Statutes Annotated, p. 630 et seq.; 2 U. S. Compiled Statutes, p. 2104 et seq.

The manner of operating distilleries and the means taken by the government to control the process of manufacture and the spirits produced until the internal revenue tax is paid are further shown by the testimony of Daniel A. Miller, the Deputy Collector of Internal Revenue for the Internal Revenue District of Maryland. Miller's Testimony. pp. 800–830. See, also, Treasury Decisions under Internal Revenue Laws, vol. 10 (1907) and vol. 12 (1909). Decisions Nos. 1,278, 1,488, 1,494, and 1,503.

The main features are the payment of an internal revenue tax of $1.10 per proof gallon, gauging and stamping being done by government officers; permission to keep the spirits for not exceeding eight years without paying the tax, in bonded distillery warehouses on the distiller's premises under control of a government storekeeper; that no one but the distiller is recognized by the government; that no one but the distiller can withdraw the spirits from bond and that the government does not make delivery to the holder of a warehouse receipt or keep any record of or supervision over such receipts; that on payment of the tax the spirits must be immediately removed from the bonded warehouse; that an allowance is made for "outage" or loss of volume by evaporation not exceeding certain quantities in a sliding scale, the maximum allowance being 13½ gallons per barrel of not less than 40 gallons, the usual capacity of a barrel being 46 or 47 gallons; that the government officers keep the keys of the distillery warehouse and can enter it in the absence of the distiller, but that the distiller cannot enter except in the presence of the government storekeeper.

The statutes provide (section 3271 [U. S. Comp. St. 1901, p. 2122]):

"Every distiller shall provide, at his own expense, a warehouse, to be situated on and to constitute a part of his distillery premises and to be used only for the storage of distilled spirits of his own manufacture until the tax thereon shall have been paid, * * * and such warehouse, when approved by the Commissioner of Internal Revenue, on report of the collector, is hereby declared to be a bonded warehouse of the United States, to be known as a distillery warehouse, and shall be under the direction and control of the collector of the district, and in charge of an internal revenue storekeeper, assigned thereto by the Commissioner."

Treasury Decision No. 1,278 holds that since the certificate holder for whisky on which the tax remains unpaid has not an unconditional ownership, no special tax as a wholesale dealer is required of him.

Treasury Decisions Nos. 1,488, 1,494, and 1,503 hold that the countersigning of warehouse certificates by a United States gauger or writing or printing his name upon them is forbidden as tending to imply a government authentication of the certificates, but permit the gauger to furnish an independent copy of a gauge report which the distillers may attach to warehouse certificates issued by them.

#### Charter of the Company.

In the argument of the case, the question was raised as to the sufficiency of the powers in the charter of the Roxbury Distilling Company to authorize it to maintain a storage warehouse and issue warehouse receipts. I do not, however, find any difficulty on this point. The objects and purposes of the corporation as defined in the charter include the following:

"First. The distilling and manufacturing of whisky, spirits and alcohol, and the dealing in and sale of the same; and for such purposes to have, hold and

construct all necessary buildings, plants, machinery and appliances suitable for the same.

"Second. The buying and selling of grain and other materials in connection therewith, and the sale of the products of the same.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Fourth. The owning and leasing real estate for the conduct of said business."

Section 3271 of the Federal Statutes, as above quoted, requires that every distiller shall provide at his own expense a warehouse to be situated on and to constitute a part of his distillery premises and to be used only for the storage of distilled spirts of his own manufacture until the tax thereon shall have been paid; so that under the statute the maintaining of a storage warehouse is obligatory upon every distiller and is hence included in the charter powers of distilling and manufacturing of whisky, spirits, and alcohol and the dealing in and sale of the same and construction of necessary buildings.

### Form of Warehouse Receipt.

The form of warehouse receipt used by the Roxbury Distilling Company for lots of more than five barrels is as follows:

United States Internal Revenue.

.....bbls.                                              Stored in Warehouse No. ......,
                          Series K (Trade-Mark) No. ......
        Distillery Warehouse of the Roxbury Distilling Co. 15th District of Md.
                          Roxbury, Washington Co., Md.

This is to certify that on (date) we have on storage in the above-named distillery warehouse for account and risk and subject to the order of ...... ... barrels of our Pure Rye Whisky distilled, marked and numbered as per margin, which we will deliver only upon presentation of this warehouse receipt and upon payment of the tax and storage at the rate of five cents a month for each barrel from ......

This receipt is issued in deference to the laws of the state of Maryland, and of the United States of America. Loss or damage by fire, the elements, accidents and natural decay, at owner's risk.

*Charges for storage follow the whisky and will not be collected until the goods are withdrawn; accrued charges for storage, therefore, should be arranged between the buyer and seller whenever this receipt changes hands.*

For checks against this receipt, see withdrawals endorsed on other side.

. Thomas Leishear [Seal]                                Geo. T. Gambrill [Seal]
              Treasurer.                                           President.

| Serial Numbers. | Wine Galls. | Proof. | Proof Galls. | Date of Entry. |
| --- | --- | --- | --- | --- |

The receipts for five-barrel lots, of which a great many were issued, are in the same form, except that these receipts bear no date of issue, and the storage charges are six cents a month per barrel instead of five cents. The dates of the issue of the five-barrel certificates can be supplied, and in most cases have been supplied in the testimony, by inspection of the stub of the receipt book from which they were taken. On some of the certificates issued to pledgees the rate of storage is stricken out. In addition to these two forms of receipts intended to be negotiable, there were earlier forms, one signed by Mr. Gambrill personally before the incorporation, another signed by Mr. Gambrill alone as president and not countersigned by the treasurer, and also a form of receipt marked "nonnegotiable." These are alluded to in the testimony, which shows that only a few of the nonnegotiable receipts are outstanding, and none of them appear to have been presented to me by the claimants or petitioners. On May 10, 1904, a resolution was passed by the directors providing that all receipts thereafter should be signed by the president and treasurer, and that the earlier forms should be recognized for delivery of the goods or exchanged if the holders so desire.

### Validity of Distillery Warehouse Receipts Governed by Local Law.

It must be recognized that the determination of the question of the validity of distillery warehouse receipts depends upon the local law regulating

transfers of personal property, and that the federal courts in determining such questions are governed by the local law so far as the same has been regulated by statute or has by virtue of judicial decisions become a rule of property upon which titles are founded and recognized. The decisions of courts of other states, and even of the federal courts of other districts, are authorities only to the extent that they elucidate principles of common law applicable to the case, or interpret statutes of similar import to the Maryland statutes. Bryant v. Swofford Bros., 214 U. S. 279, 290, 29 Sup. Ct. 614, 53 L. Ed. 997; Security Warehousing Co. v. Hand, 206 U. S. 415, 425, 27 Sup. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789; York Mfg. Co. v. Cassell, 201 U. S. 344, 351, 352, 26 Sup. Ct. 481, 50 L. Ed. 782; Thompson v. Fairbanks, 196 U. S. 516, 522, 25 Sup. Ct. 306, 49 L. Ed. 577; Dooley v. Pease, 180 U. S. 126, 128, 21 Sup. Ct. 329, 45 L. Ed. 457; Etheridge v. Sperry, 139 U. S. 266, 277, 11 Sup. Ct. 565, 35 L. Ed. 171; Green v. Van Buskirk, 7 Wall. 139, 148, 150, 151, 19 L. Ed. 109; Sioux City R. R. v. N. A. Trust Co., 173 U. S. 99, 107, 19 Sup. Ct. 341, 43 L. Ed. 628.

## The Maryland Statutes.

The Maryland statutes bearing upon the question of the validity of distillery warehouse receipts are the following:

(1) The recording act, Code, art. 21, § 41, being originally the Act of 1729, c. 8, which now reads as follows:

"No personal property, of any description whatever, whereof the vendor, mortgagor or donor shall remain in possession, shall pass, alter or change, or any property therein be transferred to any purchaser, mortgagee or donee, unless by bill of sale or mortgage acknowledged and recorded as herein provided; but nothing herein shall be construed to extend to any sale or gift, where the same is accompanied by delivery, nor to invalidate such transfer as between the parties thereto."

(2) Article 14 of the Code, title "Bills of Lading, Storage and Warehouse Receipts," being originally Act of 1876, c. 262, with sections subsequently added. The provisions of the 11 sections of this act are as follows:

"Section 1. All bills of lading and all receipts, vouchers or acknowledgments whatsoever in writing, in the nature or stead of bills of lading for goods, chattels or commodities of any kind, to be transported on land or water, or on both, which shall be executed in this state, or being executed elsewhere, shall provide for the delivery of goods, chattels or commodities of any kind within this state, and all warehouse, elevator or storage receipts whatsoever for goods, chattels or commodities of any kind stored or deposited, or in said receipts stated or acknowledged to be stored or deposited for any purpose in any warehouse, elevator or other place of storage or deposit in this state, shall be and they are hereby constituted and declared to be negotiable instruments and securities, unless it be provided in express terms to the contrary on the face thereof, in the same sense as bills of exchange and promissory notes, and full and complete title to the property in said instruments mentioned or described, and all rights and remedies incident to such title, or arising under or derivable from the said instruments, shall inure to and be vested in each and every bona fide holder thereof for value, altogether unaffected by any rights or equities whatsoever, of or between the original or any other prior holders of or parties to the same, of which such bona fide holder for value shall not have had actual notice at the time he became such."

Sections 2, 3, 4, and 5 relate to bills of lading only.

Section 6 provides that every instrument described in the preceding sections shall be conclusive evidence in the hands of a bona fide holder that the goods have been actually received and were in the custody of the person or corporation issuing the instrument.

"Sec. 7. Every acceptance of an order and every other voucher whatsoever, for any goods, chattels or commodities as on storage or deposit, whereby the custody or possession of such goods, chattels or commodities shall be acknowledged or certified by any warehouseman, wharfinger or other person or corporation within this state, and which acceptance or voucher shall not on its face provide or stipulate in terms that it shall not be negotiable,

shall be held and taken when issued to be a negotiable receipt and instrument to all intents and effects within the meaning and operation of this article.

"Sec. 8. Any instrument declared negotiable by this article shall be held and taken to have been issued within the meaning of this article when it shall have been signed and shall have been delivered out of the custody of the person or corporation to be charged or bound by the same, or of his or its agent or officer aforesaid."

Section 9 prohibits the issuing of bills of lading or storage receipts unless the goods have been actually received to be transported "or shall be actually in the possession or custody, or upon the premises, or under the absolute and exclusive control of such person or corporation * * * at the time when such instrument shall be issued," with a punishment by fine.

Section 10 punishes the issuing of duplicates or delivery of goods except to the holder of such instrument.

Section 11 saves all civil rights notwithstanding the criminal provision.

(3) The Act of 1906, c. 19 (effective June 1, 1906, under Constitution, art. 3, § 31), adding a new section to article 14 to be known as section 12. This statute in full with its title is as follows:

"An act to add a new section to article 14 of the Public General Laws, 1904, title 'Bills of Lading, Storage and Elevator Receipts,' relating to warehouse receipts, to come in after section 11 of said article, and be called section 12.

"Section 1. Be it enacted by the General Assembly of Maryland, that a new section be and the same is hereby added to article 14 of the Code of Public General Laws, 1904, title 'Bills of Lading, Storage and Elevator Receipts,' to come in after section 11 of said article, and to be called section 12, and to read as follows:

"12. Bonded warehouses of the United States, known as distillery warehouses, as defined by and existing under the laws of the United States of America and situated in this state, shall be deemed to be warehouses within the contemplation and meaning of this act, and such distillery warehouses shall be subject to all the provisions of this article not inconsistent with the laws of the United States regulating the conduct and operation of such distillery warehouses, and all warehouse receipts hereafter issued by such a distillery warehouse shall be governed by and subject to all the provisions of this article as fully to all intents and purposes as the warehouse receipts of any other warehouseman, corporation or person conducting a general warehousing business in this state.

"Approved February 27, 1906."

This last statute, read in connection with the two former ones, and with the federal statutes regulating distillery warehouses, to my mind removes from question all warehouse receipts issued on or after June 1, 1906, by distillers for spirits of their own manufacture stored in their own bonded warehouses and vests title absolutely in the certificate holder as owner, or in the pledgee of such certificate for the purposes of securing his loan. This is the clear intent of the statute expressed in unmistakable and apt terms.

The constitutionality of this act is attacked by reason of its subject not being described in its title under Constitution, art. 3, § 29. Statutes have frequently been held void for this reason by the Maryland Court of Appeals, but only where there was something misleading in the title, or some provision in the body of the statute, to which the title failed to call attention, as in Luman v. Hitchens, 90 Md. 14, 23, 44 Atl. 1051, 46 L. R. A. 393; Christmas v. Warfield, 105 Md. 530, 541, 66 Atl. 491.

On the other hand, it has been repeatedly held that a title indicating the addition of a new section to an existing act or article of the Code and referring to the subject-matter, or even without such reference to the subject-matter, is an appropriate title. Second German American Bldg. Ass'n v. Newman, 50 Md. 62, 65; State v. Applegarth, 81 Md. 293, 303, 31 Atl. 961, 28 L. R. A. 812; Garrison v. Hill, 81 Md. 551, 554, 555, 32 Atl. 191; Himmel v. Eichengreen, 107 Md. 610, 613, 69 Atl. 511; Kingan Packing Association v. Lloyd, 110 Md. 619, 625, 73 Atl. 887. See, also, a very full discussion of the scope and purpose of this constitutional provision by Burke, J., in Fout v.

Frederick County, 105 Md. 545, 66 Atl. 487, citing Cooley's Constitutional Limitations (3d Ed.) 175, 158.

In the same case the argument of appellants gives the substance of the 46 cases in which the application of this section of the Constitution had been previously considered in Maryland.

Article 14 relates to bills of lading, storage, and elevator receipts, and the new section added by the Act of 1906, c. 19, gives to warehouse receipts issued by a distillery warehouse the attributes given to other warehouse receipts by that article.

Given the fact that storage warehouse receipts of a general warehouseman are good notwithstanding the recording laws, and the intention of the Legislature being that distillery warehouse receipts should have the same attributes, I can see no necessity for entitling the act otherwise than as adding an additional section to article 14.

I have carefully considered the criticisms of the phraseology of this act contained on pages 12 to 16 of the brief of the Franklin Bank, but I cannot see any force in them. "Bonded warehouse of the United States" is a loose and inaccurate description of a distiller's warehouse for the storage of taxable spirits under bond to the United States; but this is the exact language used in section 3271 of the Federal Statutes. The following words, however, "known as distillery warehouses, as defined by and existing under the laws of the United States," are a proper description of such warehouses, which are also called by the same designation of "distillery warehouses" in the federal statute to which reference is made, and which are of uniform character.

Since the receivership in this case on February 21, 1910, the Legislature has repealed the whole of article 14 of the Code, and by Acts of 1910, cc. 336 and 406, has enacted the Uniform Bills of Lading and Warehouse Receipts Acts instead of said article 14. These acts both took effect June 1, 1910, and do not affect the present case.

## Validity Irrespective of Statute.

The question of the validity of warehouse receipts issued prior to the Act of 1906, c. 19, or irrespective of that act, by distillers for spirits of their own manufacture stored in their own bonded warehouses, is an extremely interesting one and has been fully and ably argued. My conclusion after careful consideration of the arguments and of the authorities cited is in favor of the validity of such receipts in the hands of purchasers or pledgees; and that they are valid not only inter partes or against solvent distillers, but absolutely as vesting title in such purchasers, or liens in favor of such pledgees, against subsequent creditors.

The Maryland law requiring the recording of bills of sale (Code, art. 21, § 41) makes an exception of cases where there is a "delivery." There has been no physical delivery here, and to sustain the distillery receipts as passing title it is necessary to bring them within the scope of constructive delivery.

## Constructive Delivery.

Where the goods are of such a nature or in such condition or in such situation that the moving of the goods is either impossible or productive of great and unreasonable inconvenience or expense, the development of commerce and the growing necessity of ready sales and pledges has caused certain substitutes for physical delivery to be recognized by mercantile custom and to receive judicial sanction. The growth of this constructive or symbolical delivery following the advancing complexity of trade is extremely interesting.

In Hall v. Richardson, 16 Md. 396, 412, 77 Am. Dec. 303, the court says as to what constitutes delivery: "Regard must be had to all the facts bearing upon the particular question, and, especially, to the character of the transaction in which the parties may have been engaged, *to ascertain whether the delivery was such as the nature of the case admitted.*"

And again: "Where the goods are ponderous, actual delivery is not required; a constructive delivery may be implied from various acts, among

which are, designating them for the use of the purchaser by marking, or removing them for the purpose of being delivered."

Among the Maryland cases illustrating this are the following: Van Brunt v. Pike, 4 Gill, 270, 275 (45 Am. Dec. 126), a case of pig iron in which the court applies the test "incapable in the ordinary course of business of actual delivery." Atwell v. Miller, 6 Md. 10, 18, 61 Am. Dec. 294, a case in which bales of heavy goods were set aside and marked while in the vendor's possession. See, also, Thompson v. B. & O. R. R., 28 Md. 396, a case involving the transfer of ownership of pig iron.

In Hatch v. Standard Oil Co., 100 U. S. 124, 25 L. Ed. 554, there was a sale of a million barrel staves under a contract that delivery should be deemed complete upon piling and counting the staves, though still under the control of the vendor, and the court held as against a creditor of the vendor that title had passed to the vendee by constructive delivery. See, also, Leonard v. Davis, 1 Black, 476, 17 L. Ed. 222, in which logs floating in the water were held to have passed into the constructive possession of the vendee.

In 35 Cyc., Title Sales, p. 309, it is said: "And where from the character or condition of the goods an actual manual delivery is impracticable, a constructive or symbolical delivery is sufficient."

### Bills of Lading.

Passing from the class of cases in which the character of the goods delivered justifies the recognition of a constructive or symbolical delivery, we next come to that class of cases where the goods are not at hand to be physically transferred, but are in transit by land or water, and so we find the carrier's receipt or bill of lading recognized as evidence of ownership and possessing negotiability. An early case illustrating this development of the law of constructive delivery is Conard v. Atlantic Ins. Co., 1 Pet. 386, 445, 7 L. Ed. 189. See, also, Baltimore & Ohio R. R. v. Wilkens, 44 Md. 11, 22 Am. Rep. 26, before the Act of 1876, c. 262, and Tiedeman v. Knox, 53 Md. 612, after that act.

### Warehouse Receipts.

From bills of lading the transition is easy to the receipt of a warehouseman, a party independent of the seller and the buyer, a disinterested person acting merely as custodian of the goods. Gibson v. Stevens, 8 How. 384, 399, 401, 12 L. Ed. 1123.

A "warehouse receipt" has been defined to be a written contract between the owner of the goods and the warehouseman; the latter to store the goods, and the former to pay for that service. Sinsheimer v. Whitely, 111 Cal. 378, 380, 43 Pac. 1109, 52 Am. St. Rep. 192.

In Hale v. Milwaukee Dock Co., 29 Wis. 482, 488, 9 Am. Rep. 603, in a most instructive opinion, after stating that the English courts place bills of lading and warehouse receipts on the same footing, the court adds: "And so do the courts of this country, in which it has been held that the indorsement and delivery of the warehouse document transfers the legal title and constructive possession of the property. It is a good symbolical delivery, equivalent, in the then situation of the property, to the delivery of the property itself."

I can do no better at this point than repeat the language of Robinson, J., in State v. Bryant, 63 Md. 66, 68, quoted in the brief of the Merchants' National Bank:

"Goods and chattels in the hands of the carrier were incapable of being actually delivered during the transit, and after they arrived at the place of delivery, it might be to the interest and convenience of the owner that they should be stored to await a future sale. Hence for the purpose of facilitating business transactions, the law recognized bills of lading, warehouse, elevator, and storage receipts, as the symbols of the property represented by them, by the delivery or indorsement of which the title to the property was transferred to the holder. They stood in the place of the property, and operated as a constructive or symbolical delivery of the property itself."

### General Warehouseman Issuing Receipt for His Own Goods.

As I read the cases, the decided weight of authority is in favor of the proposition that a general warehouseman having goods of other parties in

his warehouse may store his own goods therein and issue receipts against them which will have the validity of warehouse receipts.

In 30 Am. & Eng. Ency. of Law (2d Ed.) p. 74, the statement is made:

"By the weight of authority a warehouseman having property of his own stored in his warehouse may, in the absence of statute, issue receipts therefor, and pledge them as collateral security for his own debt by delivery of the receipt."

In 31 Cyc. p. 806, it is said:

"And at common law a warehouseman, having property of his own in store, may make a pledge of it to secure a debt, by executing and delivering an ordinary warehouse receipt which will be valid against subsequent creditors."

In Swedish-American National Bank v. First National Bank, 89 Minn. 98, at page 116, 91 N. W. 218, at page 224 (99 Am. St. Rep. 549), the Supreme Court of Minnesota said:

"It is elementary that a valid pledge of personal property can be created only by a delivery to the pledgee of either an actual or constructive possession of the pledged property. The delivery of a recognized symbol of title, such as a warehouse receipt, issued by a warehouse as owner, is sufficient as a constructive delivery. But in such case the identical property must be retained by the pledgor as bailee of the pledgee. Other property of like character and kind cannot be substituted. National Exchange Bank v. Wilder, 34 Minn. 149, 24 N. W. 699. This is the common-law rule, and is presumed to be the same in all the states."

In State, use of Hart-Parr Co., v. Robb-Lawrence Co., 17 N. D. 257, 115 N. W. 846, 16 L. R. A. (N. S.) 227, the question was presented of a general warehouseman issuing receipts for his own goods, and decided in favor of the validity of such receipts. The North Dakota Supreme Court bases its decision on the argument that, if the warehouseman should deliver the goods physically to the pledgee and then receive the goods back on storage, the warehouse receipt would be good, and then asks the pertinent question, "Was such a formal transfer and retransfer of the actual possession necessary to create a valid pledge and deposit or bailment of the property?" The form of certificate in the case cited is a fiction and reads: "Received in store from the Hart-Parr Co. on account of themselves the goods named below."

It may be noticed in passing that the certificates in the Miller Pure Rye Distilling Co. Case in the federal court in Pennsylvania, discussed below, contain a similar fiction, "Received on storage from ourselves ——— subject to our order"; while in the Foxtown Distilling Co. Case, also discussed below, the direct statement is used, "This certifies that I have in this distillery warehouse ——— to be delivered to J. M. Sheldon & Co., or order, on return of this warehouse receipt," etc.: and in the case at bar a similar direct statement is used, "This is to certify that on (date) we have on storage in the above-named-distillery warehouse for account and risk and subject to the order of," etc.

In the Robb-Lawrence Case, last cited, a number of authorities have been collected by the court. In the note to the Robb-Lawrence Case in 16 L. R. A. (N. S.) 227, the cases for and against the validity of a warehouseman's receipt for his own goods are collected, and it is said: "It is held by what is probably the weight of authority that such a pledge is valid." See, also, the opinion of Judge Cooley, in Merchants' & Manufacturers' Bank v. Hibbard, 48 Mich. 118, 122, 11 N. W. 834, 836 (42 Am. Rep. 465), in which the court held that a pledge made by a warehouseman in the form of a warehouse receipt for his own flour was valid, adding "for the laws of trade are made and exist for the protection of trade, and they should not tolerate rules which have the effect to border the chambers of commerce with legal pitfalls."

## Receipt of Vendor or Pledgor Who is Not a Warehouseman.

A vendor or pledgor cannot make himself a warehouseman by issuing receipts for his own goods in his own possession, and the doctrine of constructive delivery by warehouse receipts stops short of permitting him to do so.

In the Maryland case of State v. Bryant, 63 Md. 66, the court held, in an opinion by Robinson, J. (Alvey, C. J., dissenting), that a canner could not, by issuing a storage receipt for tomatoes canned by him, make himself a ware-

houseman and could not be convicted under Act of 1876, c. 262, for unlawfully delivering the goods for which such a receipt had been issued. At page 70 of 63 Md., the court says:

"It is clear, then, both from the language of the act itself, and the purposes for which it was passed, that the Legislature never meant to declare that a mere receipt, issued by one engaged in the canning business, for goods canned by him, and which were to remain in his possession, subject to the order of the purchaser, should pass title to the goods as against all other persons, and should also be negotiable in the same sense as bills of exchange and promissory notes. Nor do we see any reason, either of public or private interest, why the act should be so construed by implication. Persons engaged in the canning business have the same right to make sales of goods canned by them by delivery, or by the indorsements of bills of lading, warehouse, or storage receipts, as persons engaged in any other business. And if the act of 1876 is to be construed as embracing receipts issued by them for goods of their own canning, and which are to remain in their possession, upon the same grounds it must be construed to extend to receipts issued by all other persons—to the farmer, for wheat in his barn, and to the manufacturer, for goods in his factory. Such a construction would in a measure repeal the well-settled law of this state, which declares that no sale of personal property of which the vendor remains in possession, shall be valid except as between the parties, unless by a bill of sale or mortgage duly executed and recorded; and would destroy the safeguards, which the law has wisely thrown around the sales of personal property, for the protection of purchasers and creditors."

In the case of Security Warehousing Co. v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789, an evasion was attempted by the Racine Knitting Company in leasing a portion of its premises to the Security Warehousing Company so as to enable the latter to issue warehouse receipts. The Supreme Court of the United States held that this did not amount to a warehousing of the goods.

In Thurber v. Oliver (C. C.) 26 Fed. 224, Judge Morris, sitting in this court, held, following State v. Bryant, supra, that a canner could not issue a valid storage warehouse receipt for his own product.

It is hardly necessary to cite more than these three decisions on this point, embracing as they do the definite judgment of the highest court of the state, the Supreme Court of the United States, and the court in which the case at bar is now pending. There are a great many such cases, in some of which various transparent devices of a fictitious warehouseman or a fictitious possession of a real warehouseman were attempted, as in Security Warehousing Co. v. Hand.

In re Millbourne Mills Co., 172 Fed. 177, 96 C. C. A. 629, 30 L. R. A. (N. S.) 552, may be referred to here as a recent case which is discussed in the Miller Case in the Pennsylvania federal courts (cited infra). This case was that of a milling company whose storage receipts for its own grain and flour were held not to be warehouse receipts.

Washington County Bank v. Motter, 97 Md. 545, 55 Atl. 313, was a precisely similar case to the Millbourne Mills Case.

The case of Textor v. Orr, 86 Md. 392, 38 Atl. 939, was strongly urged by counsel for the Franklin Bank, as authority for the broad contention that a pledge of personal property in the debtor's custody cannot be made valid against subsequent creditors otherwise than by a chattel morgage. As this is an important Maryland case, I have given it careful consideration. In this case McCauley, the debtor, and Textor, the creditor, signed a paper by which McCauley "gives" certain barrel hoops in McCauley's possession to Textor "as security for the payment of four notes" and Textor "agrees to release his claim against said hoops upon the payment of the last-mentioned note." McCauley having made an assignment to Orr for the benefit of creditors, the court said (page 397 of 86 Md., page 939 of 38 Atl.):

"It is clear, we think, that the contract above set forth did not constitute a pledge of the hoops as security for the debt, because transfer of possession of the thing pledged to the pledgee or to a third party for his benefit is essential to the creation of a pledge. Casey v. Cavaroc, 96 U. S. 490 [24 L.

Ed. 779]; Moors v. Reading, 167 Mass. 322 [45 N. E.' 760, 57 Am. St. Rep. 460]. In the case now before us, the hoops remained in the possession and under the control of McCauley.

"Nor can the agreement be effective as a bill of sale or chattel mortgage, as against third parties, because it is not acknowledged and recorded as required by the Code, in all cases where the seller or mortgagor of chattels remains in possession. Article 21, § 40, of Code."

And the court held that the paper was good inter partes and against prior creditors as an equitable mortgage, but not good against subsequent creditors.

This case shows that a debtor may hypothecate his goods to secure his creditor against all possible claimants in either one of two ways:

(1) By a delivery of the article pledged.

(2) By a chattel mortgage duly recorded.

But there is nothing in the case to deny the effect of constructive delivery or of warehousing universally recognized as equivalent to such delivery. There was no warehousing in the case or anything in the nature of a warehouse receipt, but simply a clear evasion of the recording law by an attempt to pledge undelivered goods, which the court refused to sanction. I cannot regard this case as making as strongly against the *warehouseman* of his own goods, as the other cases last cited.

### Warehouse Receipts of a Distiller for His Own Goods in His Bonded Distillery Warehouse.

We now come to the exact turning point of the case at bar: Whether a distiller's storage receipts for spirits manufactured by him, being in the form of distillery warehouse receipts, are to be considered as having the validity (independently of the Act of 1906, c. 19) of the receipts of a general warehouseman, or whether they come within the exception of a fictitious receipt for his own goods by one who is not a warehouseman. It seems clear to me that there is adequate reason for recognizing the validity of distillery warehouse receipts which has been given to them by long course of dealing by the traders and the banks, and that this contention should prevail. It is a growth and development of the doctrine of constructive or symbolical delivery which I have attempted to trace in this opinion, and of the underlying principle, that the courts will recognize as constructive delivery that form of delivery which the character and situation of the goods imperatively requires. I was much struck with the phrase of one of the counsel that any form of delivery of distilled spirits other than by the storage receipts of the distiller is "commercially impossible." The situation is quite different from that of canned tomatoes, flour, or other products of manufacture. Here the goods must be stored until they attain the requisite age. The annual production, worth perhaps $5,000,000 per annum in Maryland, or $30,000,000 in six years, must be available for sale or hypothecation or the industry cannot be carried on. To pay the taxes and store the goods in a "free" warehouse would involve loss and expense which would be absolutely useless and ruinous to the manufacturer. Let us consider what the elements of this loss and expense would be:

(1) The payment of the tax of $1.10 per gallon immediately upon the distillation of the spirits instead of at the end of six or eight years would involve a loss in interest of from 39.6 cents to 52.8 cents per gallon, almost equivalent to the initial value of the spirits when distilled.

(2) The distiller would forfeit the allowance for leakage or evaporation known as "outage" amounting to say 30 per cent. of the bulk of the goods, or 33 cents per gallon for the tax if estimated upon the original bulk.

(3) The insurance would be trebled, as the "free" goods would have to be insured for $1.60 per gallon instead of 50 cents per gallon.

If my calculations are correct, the loss and expense by not allowing the spirits to remain in bond might reach $1 per gallon on spirits of which the initial value is about 50 cents per gallon, which would be prohibitive. The system of allowing the goods to remain in the warehouse under federal supervision and control is expressly designed to facilitate the maturing or aging of the spirits without putting the distiller to this expense, and if a

single distiller should· avail himself of the bonded distillery warehouse system it would be commercially impossible for any competitor to withdraw his product immediately after distillation, pay the tax, and store the product in a "free" warehouse of a general warehouseman.

General bonded warehouses apart from the distillery premises are authorized by the federal statute in the discretion of the Commissioner of Internal Revenue, but it appears from the testimony that the only warehouse of this sort in Maryland was abandoned 10 years ago.

The spirits must stay in bond; and, staying in bond, they must be sold or carried financially during the aging process and must be susceptible of a form of constructive or symbolical delivery which will make a valid sale or pledge. The statutes I have quoted show that the government recognizes only the distiller and that there is no possible way of delivering the goods or of warehousing them, except by the storage receipt of the distiller himself. The federal statute, while not recognizing the receipts of the distiller, does recognize the place of storage as a warehouse, and I see no reason why the recognition of a warehouse receipt as a form of symbolical delivery cannot be extended to a distillery warehouse receipt for his own goods by the distiller himself. The reason of the rule requiring delivery in order to pass title to personal property is that the goods should not appear to be in the ownership of the vendor or pledgor and give him a false credit. This reason does not reach this case. The goods are hidden from view under the powerful control of the government officers. There is not that "ostensible ownership" which the court said in one of the cases must be negatived to constitute constructive delivery. No one giving credit to a distiller could possibly know whether his warehouse is full or empty, and there is no deception such as would result from having canned goods or flour in possession of which the title had passed. Moreover, from the universal course of carrying on the business of marketing the product of a distillery, the fact that receipts are outstanding is well known to any one who deals with a distiller.

As it presents itself to me, therefore, the delivery of these receipts must be recognized by the courts, or the distillers must enormously increase their capital to enable them to carry the product for six or eight years exclusively on their own resources.

#### Custom.

In the testimony offered before me, Mr. John H. Wight, president of the Sherwood Distilling Company (Testimony, p. 626, and following), and Mr. William P. Cummings, president of the Melvale Distilling Company (Testimony, p. 633), two large distilleries in this district, and Mr. Charles T. Crane, president of the Farmers' & Merchants' National Bank (Testimony, p. 636), showed that distillery warehouse receipts similar to those in controversy in the present case were commonly issued by distillers and were regarded in the trade and by the banks as equivalent to a delivery of the goods for the purpose of passing title to the goods on storage or hypothecating such goods to pledgees of the certificates. This testimony is corroborated by Mr. George G. Atkinson, the Secretary of the Baltimore Warehouse Company (Testimony, p. 321). Mr. Atkinson testified that the production of whisky in Maryland is over 200,000 barrels a year, and that it is practically all represented by receipts of this kind. It is true that a custom of this sort cannot be recognized, as Judge Archbald says in the Miller Case, cited infra, when it flies in the face of the law; but when a custom is found to be universal, and the failure of the court to recognize such custom involves the unsettling of securities of considerable magnitude commonly recognized by the trade and the banks, it is the duty of the court, if not in contravention of any fixed principle of law, to recognize the custom judicially.

In Gibson v. Stevens, 8 How. 384, 399, 12 L. Ed. 1123, Chief Justice Taney, in speaking of the recognition of the negotiability of warehouse receipts as equivalent to delivery, said:

"It has existed long enough to assume a regular form of dealing; and it embraces such a wide extent of territory, and is of such general importance,

that its ordinary course and usages are now publicly known and understood; and it is the duty of the court to recognize them, as it judicially recognizes the general and established usages of trade on the ocean. For if, by any decision of this court, doubt should be thrown upon the validity and safety of a contract, fairly made according to the usages of this trade, and in the ordinary course and forms of business, the want of confidence would seriously embarrass its operations, to the injury of all connected with it, and would certainly be not less injurious to the agriculturist and producer than to the merchant and trader.

"This mode of transfer and delivery has been sanctioned in analogous cases by the courts of justice in England and this country, and is absolutely necessary for the purposes of commerce."

The point was made in the argument, and has considerable weight, that the parties who are contesting the validity of these distillery warehouse receipts in the present case are themselves the holders of similar receipts. The general creditors are few in number and small in amount; the aggregate as shown by the receivers' report being only about $6,000. None of these creditors have taken part in the present contest. It seems to me fair to argue that the present contestants holding similar receipts themselves, and relying upon their validity when they took them, are shown to have known of this method of dealing between this distillery and its customers or the banks from which it borrowed. It is true they did not know in fact, and could not know, of the fraud of Gambrill in issuing duplicate receipts for the same barrels, as they had no right to inspect the company's books for the purpose of ascertaining what receipts had been issued. It is clear, however, that by accepting similar receipts as collateral for loans made by them, they knew of this method of dealing with the whisky on storage and that the receipts were habitually taken as a constructive delivery of the goods.

They dispute the very form of delivery which they themselves relied upon in their transactions.

### Distillery Warehouse Receipt Cases in Other States.

There have been a few decisions in other states as to the character of distillery warehouse receipts as proper warehouse receipts. In the most important of these cases the receipts were issued in Kentucky and they turn upon the Kentucky Statutes. I cannot regard the cases of Greenbaum v. Megibben, 10 Bush. 419, Cochran v. Ripy, 13 Bush, 495, and other Kentucky cases cited, as of much authority in determining the question of the validity of the receipts in the case at bar, as the Kentucky statute seems to fix the status of the custodians of whisky as warehousemen. The statute as quoted in 13 Bush, at page 501, makes "all persons, firms, corporations, companies, etc., who shall receive cotton, pork, corn, whisky, etc., or any kind of produce, merchandise, etc., or any description of personal property whatever, in store, or undertaking to receive or take care of the same, with or without compensation, warehousemen." And another section, quoted on page 502 of 13 Bush, and referred to on page 505 of 13 Bush, "was intended to apply to property owned by warehousemen." These statutes are so broad that the decisions under them sustaining distillery warehouse receipts cannot have very great weight on the general question of the status of such receipts.

In Commonwealth v. Walker, 121 Ky. 274, 89 S. W. 180, the court says: "Section 2572A, Ky. St. 1903, defines the word 'distiller,' and subsection 6 thereof recognizes him in the capacity of warehouseman, and authorizes him to issue warehouse receipts." From an examination of the Kentucky Statutes I find that this section was enacted in 1896.

In Van Schoonhoven v. Curley, 86 N. Y. 187, a distillery receipt was issued by a distiller in Kentucky for certain barrels of whisky and the holder delivered the receipt to a third party with a memorandum of sale of the goods to him. The original holder then secured possession of the whisky in contravention of the rights of his vendee. The decision turned on the fact that the statute in force at that time required the withdrawal of the whisky within one year from the time the receipt was issued (instead of eight years, as at present), and it was held that, a year having elapsed, the

delivery to the original holder protected the distiller, as the time for which he agreed to hold the whisky on storage had expired. The following language of the court in this case, at page 191 of 86 N. Y., contains a very strong argument in favor of the general validity of distillery warehouse receipts during the storage period:

"The defendants were warehousemen, not in the usual sense, but from necessity and force of law. Their duties were by statute confined to a single article and that of their own production. As the place of storage of that article is defined by statute, so is the length of time prescribed during which the storage may continue. As distillers, they were required to provide a warehouse on their distillery premises, constituting a part of it and to be used only for the storage of distilled spirits of their own manufacture until the tax thereon is paid. This, upon approval of the proper officer, 'is declared to be a bonded warehouse of the United States to be known as a distillery warehouse' (R. S. of U. S. § 3271 [U. S. Comp. St. 1901, p. 2122]) and placed in the joint custody of the proprietor thereof and the storekeeper assigned to it by the government (R. S. of U. S. § 3274 [page 2124]). * * * These provisions were known to or at least binding on both parties at the time of making the receipt."

Conrad v. Fisher, 37 Mo. App. 352, 8 L. R. A. 147, is a case in the St. Louis Court of Appeals in which there is some discussion of the validity of distillery warehouse receipts. In that case there was a contract between Stagg, Hume & Co., distillers, and Conrad for the manufacture of a certain quantity of whisky which was to be subsequently delivered to Conrad, and for which the distiller held Conrad's notes. Conrad, on the eve of failure, being indebted to a third party, undertook, though not a distiller or a warehouseman, to issue storage receipts and pledge them. The lien of the unpaid distiller was held superior to the rights of the pledgee. The questions decided in this case do not appear to me to be in point. The receipts were not those of the distiller.

In Miller v. Browarsky, 130 Pa. 372, 18 Atl. 643, a referee sustained a distillery warehouse receipt as against a prior sale not evidenced by such a receipt, and the court affirmed his finding.

In Rosenbaum v. Batjer, 154 Pa. 544, 25 Atl. 754, the question of the validity of distillery warehouse receipts was suggested by the lower court, but not decided. The case turned on a question of estoppel and was affirmed by the Supreme Court of Pennsylvania without an opinion. See, also, Keil v. Harris, 1 Pa. Co. Ct. R. 171; 5 Central Rep. 865; Sloan v. Johnson, 20 Pa. Super. Ct. 643; Exchange Bank v. Uhlman, 5 Pa. Dist. R. 480.

The last- three cases .are all decisions of inferior courts in Pennsylvania in favor of the validity.

### The Pennsylvania Federal Cases.

The precise question involved in this case, the validity of distillery warehouse receipts of an insolvent distiller, has been before the federal courts of the Third circuit quite recently in two cases. One of these cases is In re Miller Pure Rye Distilling Co., 176 Fed. 606, being a case in the District Court for the Eastern District of Pennsylvania decided by McPherson, District Judge. The same case on appeal to the Circuit Court of Appeals for the Third circuit was heard by Buffington and Lanning, Circuit Judges. and Archbald, District Judge, and there entitled Taney, Trustee, v. Penn National Bank. The other case is In re Foxtown Distilling Co., in the Circuit Court for the Western District of Pennsylvania, decided by Orr, J., confirming the report of a special master. This case is pending on appeal to the Circuit Court of Appeals for the Third circuit, and is there entitled Boarts, Trustee, v. Selden. For brevity I will call these cases the Miller Case and the Foxtown Case.

In the Miller Case, Judge McPherson in the lower court sustained the validity of the receipts. On appeal Judge Archbald delivered an opinion reversing Judge McPherson and holding the receipts invalid. Judge Lanning delivered a separate opinion concurring with Judge Archbald. Judge Buffington dissented, being of opinion that the receipts were valid. I am in-

formed that a rehearing has been granted, so that the case is not now finally decided.

In the Foxtown Case, Judge Orr delivered no opinion, but sustained the special master upon exceptions to his report holding the receipts valid. No opinion has yet been filed in the Circuit Court of Appeals in this case, and I understand that it has been argued, and a motion for reargument granted. So that there is no final decision of the question in either case, and we have the conflicting views of five federal judges, three in favor of the receipts and two contra.

It may be noted that the Pennsylvania statute, while very differently expressed, does not differ materially in purpose from the Maryland warehouse and bills of lading statute as it stood before the act of 1906.

The Act of Assembly of Pennsylvania of September 24, 1866 (P. L. 1867, § 1363) makes warehouse receipt and bills of lading negotiable, and provides that any person to whom the said receipt or bill of lading may be transferred shall be deemed and taken to be the owner of the goods, and adds "so as to give security and validity to any lien created on same, subject to the payment of freight and charges thereon." This statute is, if anything, more strongly in favor of the ownership of the receipt holder than is the original Maryland statute, and if it had had a final construction in the federal courts of the Third circuit adverse to such receipt holders, I might feel compelled to follow such construction as to certificates prior to the amendatory act of 1906. As these cases now stand, they are simply divergent views of eminent judges, and leave the question practically undecided.

In the Foxtown Case there was a gauger's certificate on the face of the receipt. In the Miller Case there was a gauger's certificate accompanying the receipt. In the Roxbury Case, the case at bar, I gather that these gauger's certificates did not usually accompany the receipts, though in a few cases they have been offered in evidence with them. I think, with great respect, that Judge Archbald's and Judge Lanning's opinions in the Miller Case attach too much importance to the question of government *custody*. We must concede that the government is not the warehouseman and that its supervision is for a special and limited purpose, the collection of the tax, and operates only to restrict and control the real warehouseman, who is the distiller. We may concede all this and still not weaken the argument, which is most cogent to my conclusions, namely, that by reason of the government control and by reason of the government's refusal to recognize any one but the distiller, the distiller's receipt is the only possible form of delivery which can be employed unless we are to exclude from commerce and banking this large mass of property.

I quote from the very clear and convincing reasoning of Judge McPherson on this point:

"Save in one respect the case cannot be distinguished, I think, from In re Millbourne Mills Co., 172 Fed. 177 [96 C. C. A. 629, 30 L. R. A. (N. S.) 552], and, unless the distinction justifies the application of a different rule, the order of the referee was right. In my opinion, however, a material difference between that case and this is to be found in the fact that the pledged property here was stored in a bonded warehouse established and maintained under the laws of the United States. It is true that the whisky did not cease to belong to the company simply because it was stored in the warehouse. It was the product of the bankrupt's skill, labor, and capital, and in no sense belonged to the government. The stringent regulations of the federal law concerning tthe custody of distilled spirits are intended to protect the government's rights to the tax. They have no other ultimate purpose, but I think it cannot be denied that these regulations interfere so seriously with the owner's right to deal freely with the spirits that property in such a situation should not be treated as grain and flour, for example, are treated in the warehouse of a milling company. In the case of a milling company, nothing except the convenience or the desire of the parties prevents the company from delivering possession of the grain or flour to the pledgee; and therefore, if they choose to make a contract of pledge without actual or constructive delivery of the property, they must abide the consequences. But delivery of spirits in a bonded warehouse cannot be offered

by a pledgor or accepted by the pledgee. The spirits **must remain** where they are until the tax is paid and the government formally permits the removal." In re Miller Pure Rye Distilling Co. (D. C.) 176 Fed. 606, 608.

It may be noted, too, that in Pennsylvania there are general bonded warehouses which do not exist in Maryland, and the possibility of the distiller storing his goods in such warehouses and so getting a receipt of an independent bailee is another one of the grounds of the opinions of both Judge Archbald and Judge Lanning adverse to the distiller's receipts.[1]

### The State Tax Cases.

In construing the statutes of Maryland enacted for the purpose of taxing distilled spirits as personal property, distinct recognition is given in four cases by the Maryland Court of Appeals to the distiller as a warehouseman having spirits in his custody and to the holders of the warehouse receipts as owners of the spirits by virtue of the receipts as negotiable evidences of ownership.

The statute is Act of 1892, c. 704, and is amended by Act of 1900, c. 320, and codified under the article Revenue and Taxes in the Code of 1904, art. 81, §§ 214 to 224.

In Monticello Distilling Co. v. M. & C. C. of Balto., 90 Md. 416, 45 Atl. 210, the Revenue Act of 1892, c. 704, imposing a tax on spirits in bond, was considered by the court. The court held the tax constitutional except for the absence of a provision for notice to the parties interested to appear before the State Tax Commissioner to contest the valuation or for an appeal from his decision and suggested an amendment of the statute. McSherry, C. J., throughout the opinion recognizes the distiller as the warehouseman and the certificate holder as the owner of the spirits.

90 Md. page 424, 45 Atl. page 211: "Of the large number of barrels of spirits included in the returns comparatively few belonged to the company, by far the larger portion were owned by persons who were unknown to the company. The evidence of these persons' ownership were certificates issued by the company. These warehouse certificates pass by delivery, and after they leave the possession of the warehouseman or the distiller he can, with difficulty, if he can at all, keep trace of them."

90 Md. page 426, 45 Atl. page 212: "And the peculiar nature of the property itself, the known difficulty in tracing its ownership and the ease and facility with which the title to it was transferable, were all vital elements to be considered in devising a scheme for subjecting the persons who owned, had possession of or controlled these distilled spirits, to the obligation of contributing their just share to the public burden."

90 Md. page 426, 45 Atl. page 212: "As the distiller or the warehouseman is the individual through and from whom the title passes to others by means of certificates which he, and he alone, issues."

90 Md. page 426, 45 Atl. page 212: "It is no hardship because it is always in the distiller's or the warehouseman's power to immediately reimburse himself the taxes advanced for the unknown owner, and he may do this by selling enough of that owner's spirits for the purpose."

90 Md. page 432, 45 Atl. page 214: "As there is no provision of law giving the distiller, the warehouseman or the owner of the spirits the right to be heard."

In Fowble v. Kemp, 92 Md. 630, 48 Atl. 379, the court held that the taxation of distilled spirits in the hands of the distiller, though owned by other parties, was valid as to the counties in this state; a method of hearing on appeal being provided by Act of 1898, c. 275, which, however, did not apply to Baltimore City.

In Carstairs v. Cochran, 95 Md. 488, 52 Atl. 601, the taxation of spirits in the distiller's warehouse was again considered under the amended statute, Act of 1900, c. 320, and the court held the taxation to be lawful. Pearce, J., in the opinion quotes considerable portions of the text of the opinion

---

[1] Since this opinion was rendered by the special master, the Circuit Court of Appeals for the Third Circuit has decided both cases referred to in favor of the validity of the certificates. Taney v. Penn Nat. Bank (Boarts v. Selden) 187 Fed. 689, 109 C. C. A. 437.

of McSherry, C. J., in Monticello Distilling Co. v. M. & C. C. of Balto., 90 Md. 416, 45 Atl. 210, including some of the passages I have quoted above. He also says (95 Md. 506, 52 Atl. 604): "The holder of the certificate has actual knowledge of the quantity of sprits belonging to him in the distiller's hands."

The case of Hannis Distilling Co. v. M. & C. C. of Balto., 114 Md. 678, 80 Atl. 319, involves, the court says, the collection of taxes on distilled spirits "in the custody of the appellant corporation" under Code, art. 81, §§ 214–224, which "require, among other things, that the custodian of distilled spirits shall pay for the owner the taxes levied with reference to the property, but reserve a lien upon it as a means of reimbursement for the payment," and cites Monticello Distilling Co. v. Balto. City. 90 Md. 416, 45 Atl. 210; Fowble v. Kemp, 92 Md. 637, 48 Atl. 379; Carstairs v. Cochran, 95 Md. 488, 52 Atl. 601; Carstairs v. Cochran, 193 U. S. 10, 24 Sup. Ct. 318, 48 L. Ed. 596; Hannis Dist. Co. v. Balto., 216 U. S. 285, 30 Sup. Ct. 326, 54 L. Ed. 482.

Urner, J., makes use of the following expressions:

"The statutory duty * * * to pay taxes validly levied with respect to property in their custody."

"It is obviously impracticable to identify at any given time the holders of the negotiable warehouse certificates who own the spirits in storage."

It is true that these cases did not arise on a claim of ownership by the certificate holders as absolute owners or as pledgees, as in the present case of the Roxbury Distilling Company certificates; but I am unable to accept the contention of the counsel for the Franklin Bank that the scope of the expressions used is to be limited to a qualified ownership as against solvent distillers only, and think it clear from the repeated expressions of the Court of Appeals that the holder of a certificate of the distiller for whisky in a bonded warehouse is treated by that court as the owner of the goods, implying a right to assert such ownership as against subsequent purchasers or subsequent creditors of an insolvent distiller.

The case of Carstairs v. Cochran. 95 Md. 488, 52 Atl. 601, was appealed to, and affirmed by the Supreme Court of the United States in Carstairs v. Cochran, 193 U. S. 10, 16, 24 Sup. Ct. 318, 319 (48 L. Ed. 596).

In this case, Mr. Justice Brewer, in delivering the opinion of the court and sustaining the constitutionality of the tax, says: "And that for spirits so in bond negotiable warehouse receipts have been issued, do not affect the question of the power of the state."

In the case of M. & C. C. of Balto. v. Hannis Distilling Co., in the United States Circuit Court for the District of Maryland (1908), the payment of the Maryland state tax by a distiller was again resisted, and, the validity of the tax being upheld, an appeal was taken to the Supreme Court of the United States. Upon this appeal reported in Hannis Distilling Co. v. Balto., 216 U. S. 285, 30 Sup. Ct. 326, 54 L. Ed. 482, the court reviewed the federal and state decisions, and, holding that the question had been settled beyond controversy, dismissed the appeal for want of jurisdiction.

In Thompson v. Kentucky, 209 U. S. 340, 28 Sup. Ct. 533, 52 L. Ed. 822, a similar question as to the validity of a state tax under the laws of Kentucky was presented to the United States Supreme Court upon appeal from the Court of Appeals of Kentucky. The validity of the tax was sustained, and, as in the Maryland cases, the distiller is spoken of by Mr. Justice McKenna as a "warehouseman" and the certificate holders as "owners." See, also, Hartman v. Bean, 99 U. S. 393, 397 (25 L. Ed. 455), where the court says: "Concede that the owner of the distilled spirits may sell the same while the spirits are deposited in the bonded warehouse, still his sale must be regarded as subject to the tax, as the purchase was in this case, which means that the purchaser takes the property subject to the lien in favor of the United States that is created by the act of Congress."

### The Gambrill Indictment Case.

Since the argument before me in this case, the Court of Appeals of Maryland has rendered a decision on April 19, 1911, in the criminal proceedings against Gambrill for duplication of the receipts.

The demurrer to the indictment was on two grounds, the implied repeal

of the criminal section by the Act of 1910, c. 336, without a saving clause, and the point that the receipts in question were not properly warehouse receipts. The court sustained the demurrer on the first ground and did not express any views on the second. State v. Gambrill, 115 Md. 506, 81 Atl. 10.

### The Roxbury Distilling Company as Warehouseman for Gambrill.

I have not overlooked the contention made by one of the counsel that prior to June, 1906, that is to say, prior to the Act of 1906, c. 19, the Roxbury Distilling Company was the warehouseman and Gambrill was the owner, and consequently during that period the receipts might be treated as the receipts of a warehouseman or bailee who was independent of the owner of the goods. I should not be willing to rely upon this view as giving validity to the receipts, as I think the position of treating Gambrill and the Roxbury Distilling Company as independent entities is vulnerable. The views I have expressed as to the validity of distillery warehouse receipts render it unnecessary to discuss this question at any length, but the fact that Gambrill owned all the stock of the company except the qualifying shares of the directors under the original incorporation in 1900 and continued to own all the common stock except the qualifying shares of directors and three-fourths of the preferred stock under the reorganization in 1904, seems to bring this corporation during that period within the class of "one-man corporations" discussed in Pott v. Schmucker, 84 Md. 535, 36 Atl. 592, 35 L. R. A. 392, 57 Am. St. Rep. 415, and the authorities therein cited.

The Maryland Court of Appeals, in the case referred to, refused to recognize a corporation of this character as having a distinct existence from Johns H. R. Nicholson, the owner of all the capital stock, and as against creditors of the corporation refused to treat Nicholson's banking firm as entitled to participate in the assets of the corporation.

Without discussing the contention at more length, it seems to me that the reasoning of that case would prevent the treating of the Roxbury Distilling Company as an independent bailee of Gambrill.

### Validity of Certificates in Name of and Indorsed by Gambrill.

Holding that these distillery receipts are to be recognized as valid and negotiable warehouse receipts, it now becomes necessary to consider the attack which is made upon receipts issued by the company to Gambrill and indorsed and delivered by him as collateral for his own loans. We may assume the fact, which I do not think is denied, that every receipt holder other than Gambrill, whether purchaser or pledgee, acted in good faith and is a bona fide holder for value or a bona fide pledgee for a substantial loan actually made.

Now as to all receipts issued prior to June 19, 1906, it was proved that the whisky was Gambrill's, and so a receipt issued to him prior to that date represents the true ownership of the whisky which he had a right to sell or pledge. Code, art. 2, § 3.

As to all receipts issued after June 19, 1906, is it not sufficient to refer to the Act of 1906, c. 19, which I have heretofore held valid and controlling? This act, taking effect June 1, 1906, provides that all distillery warehouse receipts thereafter issued shall be governed by and be subject to all the provisions of article 14. Section 1 of that article provides that full and complete title shall vest in a bona fide holder of a warehouse receipt *altogether unaffected by any equities between the original or any other prior holders.* Section 6 provides that every such instrument shall be conclusive evidence in the hands of a bona fide holder that the goods have been actually received and were in the custody of the person or corporation issuing the instrument. Section 7 provides that such voucher when issued shall be a negotiable receipt and instrument. The act of 1906 brings distillery warehouse receipts within these provisions from a date preceding the time when the company began to own its product. See Farmers' Packing Co. v. Brown, 87 Md. 1, 10, 39 Atl. 625.

In the face of the very strong negation of equities between prior parties contained in section 1 and the wording of section 6, can it be said that the words "conclusive evidence" mean prima facie or rebuttable evidence, or still less can the burden of proof be cast on the holders to show that the company

got the money? Expressed tersely: Before June 19, 1906, the whisky was in fact Gambrill's; after June 19, 1906, the certificates are conclusive evidence, and equities between prior parties cannot be set up.

It cannot be successfully contended that the issuing of receipts to Gambrill was ultra vires or that the receipts were accommodation paper. The company was a warehouseman and had authority to issue such certificates to any person owning the whisky. In some cases, as for instance in the case of some of the barrels purchased by Gambrill from Steinhardt, he owned the whisky, and had a perfect right to a receipt from the company evidencing his ownership, and to pledge that receipt. On the other hand, take the extreme case of whisky not owned by Gambrill but the property of the company, and suppose that receipts were fraudulently issued by Gambrill to himself signed by him as president and countersigned without examination by the treasurer, and then hypothecated for his own benefit to a bona fide pledgee without notice.    •

My view of the act of 1906 is that even in such a case by the clear meaning of the statute such certificates are conclusive against the company and against holders of conflicting certificates. Gambrill's pledgees parted with their money in good faith relying on the conclusive quality and the negotiability given to the distillery warehouseman's receipt by the statute. Tome v. Parkersburg R. R., 39 Md. 36, 17 Am. Rep. 540; W. M. R. R. v. Franklin Bank, 60 Md. 36.

With this view, it seems to me unnecessary to go into the numerous authorities cited and the nice distinctions drawn on the question of implied authority, holding out of agent, ratification by the free storage resolution of 1909, change of Gambrill's actual ownership in 1906 without notice to parties who had relied on the previous course of dealing, and other questions of the agency of corporate officers which were extensively discussed in the second argument and briefs subsequently filed.

The case of Thurber v. Cecil National Bank (C. C.) 52 Fed. 513, is readily distinguishable by reason of the warehouse receipts in that case having the word "agent" after the name of the holder, thus giving notice to the pledgee that the agent was not the actual owner.

The cases in which it was held that the unauthorized attempt to make a corporation responsible for the debt of one of its officers are not in point when applied to the case of a warehouse receipt.

### The Receipts Take Priority from the Date of Their Delivery.

This proposition, or rather the two propositions, that the first receipt has absolute priority, if the receipts are valid at all, and that the date of delivery governs, were not contested in the argument, and I shall not spend any time in discussing them, except to point out that this is in accord with Code, art. 14, § 8, above quoted. See, also, Block v. Oliver, 102 Ky. 269, 279, 43 S. W. 238.

### Tracing Back of Exchanged Receipts for the Same Packages.

In some instances, notably in the case of the Windsor Trust Company and its associates, there was an exchange of earlier certificates for later certificates for the same packages in five-barrel lots. It was argued that this would release the lien of the earlier certificates and let in intervening duplicates held by other parties. The analogy was suggested to the release of a mortgage and taking a subsequent mortgage, letting in intervening liens. Woollen v. Hillen, 9 Gill, 185, 52 Am. Dec. 690; Alderson v. Ames, 6 Md. 52, 57; Neidig v. Whiteford, 29 Md. 178; Heuisler v. Nickum, 38 Md. 270, 276; Boyd v. Parker, 43 Md. 182, 202; Gardenville P. L. A. v. Walker, 52 Md. 452, 455; Green v. Western National Bank, 86 Md. 279, 38 Atl. 131. But these mortgage cases are not controlling. They are all decided on the ground that there was a release under seal which extinguished the prior mortgage, and that parol evidence could not be admitted to show that the loan was a continuous one. That this is the ground for refusing to subrogate a new mortgage to the lien of a prior mortgage *released under seal* is shown in Ahern v. White, 39 Md. 409, 417; Drury v. Briscoe, 42 Md. 154. The claim to trace back in this case is quite distinguishable. Here there is no formal release of lien, but a continuity of lien on certain packages evidenced by a different or new piece of paper.

One receipt certifies that on a certain date the company holds certain serially numbered packages for account of a certain party. Another receipt certifies that on a later date they hold the same packages for the same party. Both are true, and there is no contradiction. The lien is a continuous one never released either expressly or by implication. It was the clear intention of the parties that the substitution was merely for convenience in handling the certificates for smaller lots.

The situation seems to come within the class of illustrations given in 31 Cyc. p. 818, Title "Pledge," under the subdivision 7 E, "Delivery to Pledgor for Special Purpose," and Jones on Pledges, § 44, under the heading, "A pledgee does not lose his lien by permitting the pledgor to have possession of the property for a special and limited purpose."

I do not find the Kentucky cases, which were relied on in argument against tracing back, as so deciding.

In Block v. Oliver, 102 Ky. 269, 43 S. W. 238, the older certificate was not exchanged but surrendered by the pledgee on payment of his loan, and it was held that the junior duplicated receipt thereby became valid.

In Doherty v. Merchants' National Bank, 52 S. W. 832, 21 Ky. Law Rep. 628 (not officially reported), the bank surrendered its old receipts and took new ones as security for a loan. The old receipts were then fraudulently reissued to other holders. Held, that the bank's lien by the exchanged receipts was good.

In Roche v. Crigler (Ky.) 67 S. W. 273 (also not officially reported), it will appear from a careful examination of the case that the court found a deficiency of proof of the delivery of either the old or new receipts to the party who attempted to trace back exchanged receipts, and that this was the real ground of the decision in favor of the subsequent receipt holder, to whom it seems the old receipts were reissued with the name changed.

### Variance in Names in Exchanged Receipts.

The right of tracing back exchanged receipts would not extend to any different packages substituted for those originally pledged. Nor would it under some conditions extend to a new certificate to a different party. In the instances of such variation in the parties to whom the exchanged certificates were issued in this case, there is evidence tending to show that the party to whom the new certificates were issued is the representative of the pledgee, and the new certificates were simply made out in his name not as an assignee or new party, but simply as agent for the original holder. I think the equities of the case require the recognition of such substitution of a representative when satisfactorily explained by the testimony without losing the lien of the old certificate.

### Duplicate Receipts Considered as Second Liens.

There were two views presented as to the status of holders of junior receipts: One, that such receipts were a nullity and absolutely void; the other, that they constitute junior liens where the first certificate holder is a pledgee and his debt does not exhaust the fund. It was stated in the argument that this situation would apply only to cases where the Merchants' National Bank held the first certificate; it being obvious that in other cases the collateral realized upon would not satisfy the pledgees.

The contention that the junior receipts are void rests upon the argument that the first certificates derive their validity from constructive delivery and that there cannot be a delivery of the same goods to two parties. This would be true of actual delivery. But is it true of constructive delivery; that is to say, of warehousing? If the owner of goods in a warehouse represented by a receipt issued to him pledges that receipt to a bank for less than the value of the goods, clearly the surplus above the loan for which the security is given remains in the party whose goods are on deposit, although there is a constructive delivery to the pledgee. It is but a step from this to a double pledge or a senior and junior hypothecation. The issue of duplicate receipts by the distiller to its pledgees seems to be closely analogous to the making of two mortgages, each appearing on its face to be a first mortgage. The mortgage which has the earlier date will be a first lien, and that which has the later

date will be a second or junior lien. I think the equity of the situation requires these duplicate receipts issued by the owner of the goods to be treated in this way. Block v. Oliver, 102 Ky. 269, 43 S. W. 238.

### Marshaling of Securities.

If the rights of holders of duplicate certificates are properly held to be those of senior and junior pledgees, it follows that the principle of marshaling of securities will apply. This rule is stated in Burger v. Greif, 55 Md. 518, 525, as follows:

"The rule is too well settled to need the citation of authorities in its support, that where one person has a lien upon two funds, or two pieces of property, and another holds a lien upon but one of those funds or pieces of property, that the first lienor will be compelled, in equity, to seek satisfaction of his claim from that fund or piece of property which is not covered by the lien of the second lienor, before resorting to the fund or property which is covered by the second lien. This rule has been adopted and enforced so as, if possible, to enable all the lienors to receive payment of their claims; it being deemed inequitable that the first lienor should exhaust the fund or property to which alone the second lienor could look for payment, while he had another fund or property from which his claim could be, in whole or in part, satisfied."

The application of this rule will not be enforced to the detriment of the senior pledgee, though it may sometimes result in inconvenience in requiring him to realize upon other collateral. The rule, however, is founded upon equitable principles for the purpose of preserving the rights of the junior pledgee, and I see no reason why it is not applicable to the present case.

In the practical application of the rule as between pledgees of duplicated receipts I will ascertain the proceeds of sale of the whisky pledged and, where the first pledgee has other collateral, will suspend payment until his other collateral is exhausted or shown to be inadequate.

Where the record does not disclose that the senior pledgee has other collateral, it will be necessary for the junior pledgee seeking the benefit of the marshaling to ascertain the situation with regard to other collateral held by holders of prior receipts.

Where the additional security consists of accommodation indorsements, such accommodation indorsers should not be required to pay the first pledgee for the benefit of the second pledgee for whom they have not indorsed. I think such accommodation indorsers have a right to rely on the warehouse receipts pledged for the purpose of protecting their indorsements and to be subrogated in any case in which they may take up the obligations which they have indorsed.

### Equity in Receipts Pledged.

If it should appear that there is, any equity or surplus value in any of the packages of whisky over and above the amounts for which the same are pledged by one or more receipts, such equity will belong to the pledgor of such receipt, whether such pledgor was the Roxbury Distilling Company or one of its purchasers. In view of the fact that most of the evidences of indebtedness are in the ordinary form of collateral notes with power to the pledgee to apply the collateral to any indebtedness of the pledgor, it is not likely that this situation will arise to any great extent. If it should arise, I will allow the equity or surplus to the pledgor if a purchaser, or turn it over to the general fund for the benefit of general creditors in case of a direct pledge by the company.

### Equity in Receipts Issued to Gambrill.

If there should be any equity or surplus value in any of the receipts issued to George T. Gambrill and pledged by him after satisfying the holders of receipts and duplicate receipts for the packages therein, I think it clear that, as Gambrill is largely indebted to the company for the purchase money of goods he did not deliver, no allowance of such equity can be made to him, but should revert instead to the fund for the benefit of general creditors.

### Unsatisfied Pledgees and Purchasers are General Creditors.

It follows from the general principle of distribution of funds in equity that all pledgees whose claims are not fully satisfied are general creditors for the unpaid portions of their claims; that outright purchasers who are junior receipt holders will be entitled to the equity in their packages, if any, and to be general creditors for the balance of the value of the packages for which they hold receipts; that all holders of receipts, as owners, for packages which did not come into the receivers' hands will be general creditors for the value of such missing packages. Third National Bank v. Lanahan, 66 Md. 461, 467, 468, 7 Atl. 615.

### Charges to be Made Against Proceeds of Sale of Particular Packages.

The proceeds of sale of these goods and the goods delivered in kind by the receivers to outright purchasers are subject to certain charges:

(1) The government tax when paid by the receivers or by other parties for account of the receivers will be a proper charge upon the proceeds of sale of the packages for which such tax has been paid.

(2) The state and county taxes when paid by the receivers will be a proper charge against either the funds realized from sale of such packages or the packages themselves claimed by purchasers.

In the case of purchasers, taxes paid by the company before the receivership would also be a lien.

(3) As to storage charges, the packages pledged by the Roxbury Distilling Company or by Gambrill were by resolution of the directors passed on January 28, 1909 (Leishear's Testimony, p. 263) free of storage charges. In the case of purchasers from the Roxbury Distilling Company or from Gambrill, these charges are to be collected as called for by the terms of the receipts.

(4) As to insurance, it would seem that, as far as practicable, insurance paid by the receivers should be charged against the proceeds of sale of the particular packages by some proper method of apportionment.

(5) The same is true of the receivers' commissions on the packages sold, and expense of sale made by the receivers.

It seems fair to the general creditors that they should not bear the expense of insurance of goods in the proceeds of which they will have no share, nor in the expenses incident to the sale of such assets.

(6) The court costs and general expenses of the receivers will be paid out of the general funds, if such general funds suffice for the purpose. If not, any such deficiency must be charged proportionately to the proceeds of sale of the packages pledged.

### Summary of Conclusions of Special Master.

I am of opinion, therefore, that the legal principles which should govern the findings to be contained in my report in this case, subject to consideration of such objections as may be presented at the time of settling my report, are as follows:

1. That the distillery warehouse receipts of the Roxbury Distilling Company are valid evidences of ownership in the hands of purchasers or pledgees; the holding of pledgees being subject to the principles of the law of pledge.

2. That the receipts, unless in any case it is otherwise stated on their face, are negotiable and pass title by indorsement and delivery.

3. That such title is good against all other persons, including subsequent creditors.

4. That holders of receipts for outright purchases fully paid for, where there are no prior receipts outstanding for the same packages, are entitled to have the goods upon payment of: (a) The government tax; (b) state and county taxes paid or advanced by the company or the receivers; (c) storage charges; and (d) insurance (if any) paid by the receivers.

5. That where the goods have been sold by the receivers the proceeds of sale, where there are no prior receipts outstanding for the same packages,

are payable on proper accounting to outright purchasers from the company, as owners, and to pledgees to the extent of their loans, subject to the principles of the law of pledge. In this accounting the proceeds of the sales of particular lots of packages should be credited with a due proportion of interest earned on the proceeds of sale; and should be charged with: (a) The government tax if paid by the company or the receivers; (b) state and county taxes paid by the receivers; (c) storage charges, except where stored free on direct pledge by the company or Gambrill; (d) insurance (if any) paid by the receivers; (e) a due proportion of receivers' commissions on such proceeds of sales and on the interest earned by such proceeds, and a due proportion of expense of sale; (f) a due proportion of court costs, if the general fund will not suffice to pay the same.

6. That receipts issued to Gambrill and indorsed by him are valid in the hands of holders to the same extent as receipts issued by the company directly to purchasers or pledgees.

7. That in cases of two or more receipts for the same packages the first receipt outstanding will be given priority.

8. That in determining the priority of duplicate receipts the date of delivery of the receipt will govern, which will be determined by the date of the receipt unless evidence has been presented to show some other date of issue.

9. That in determining priorities, tracing back of the holding of packages of certain serial numbers to previous receipts exchanged for other receipts for the same serial numbers will be permitted, and the priorities determined by the date of the old certificate so exchanged.

10. That a variance in the name in which such exchanged receipts are made out will not destroy the right of tracing back if the evidence is sufficient to show that the holding is for the same account.

11. That where the same packages are pledged by two or more receipts, the rights of the holders are the same as those of senior and junior mortgagees of the same property.

12. That where the same packages are pledged to two or more parties and a senior pledgee has other collateral, the value of the whisky pledged will be ascertained but not paid to him until his other collateral is exhausted or shown to be inadequate, and then it will be paid only to the extent of the deficiency, any balance being payable to junior pledgees according to the principles of marshaling of securities.

13. That any equity in packages pledged by the company after satisfying the pledgee or pledgees thereof will revert to the company for the benefit of general creditors.

14. That any equity in receipts issued to Gambrill and pledged by him will not be allowed to him, but to junior pledgees of the same packages or to the company for the benefit of creditors after satisfying all pledgees of those packages.

15. That all pledgees whose claims are not fully satisfied will be general creditors for the unpaid portions of their claims.

16. That outright purchasers who are junior receipt holders will be entitled to the equity in their packages, if any, and to be general creditors for the balance of the value of the packages for which they hold receipts.

17. That all holders of receipts, as owners, for packages which did not come into the receivers' hands will be general creditors for the value of such missing packages.

## Settling of Special Master's Report.

I will now proceed with the examination of the claims, ascertaining the rights of the purchasers, the amount due each creditor and the priorities as to the different packages in accordance with this opinion, and, when my report is completed, I will give due notice of the time and place of settling the same, with opportunity for examination of my findings.

Attention is called to the terms of the order of reference of this case to the special master, by which all objections to the report are to be filed with me at or before the settling thereof, and only objections so filed will be considered by the court.

Brown, Marshall, Brune & Thomas, and Edgar H. Gans, for Merchants' Nat. Bank of Baltimore.

Venable, Baetjer & Howard, for Baltimore Warehouse Co.

Moses R. Walter, for Wilson Distilling Co. and others.

Bond, Robinson & Duffy, for Charles F. Hickey and others.

Keech, Wright & Lord, for Franklin Bank of St. Louis.

Alexander Hagner, for Washington County Com'rs.

MORRIS, District Judge. [1] In the matter of the distribution of the fund now in the hands of the receivers appointed in.this case, the most important question involved is the validity of the warehouse certificates upon which as security the large loans were effected which constitute the bulk of the indebtedness of the insolvent corporation, the Roxbury Distilling Company.

The warehouses and the distillery were situate in Washington county, Md., and the warehouses were such as the distiller is required by the internal revenue laws of the United States to maintain for the storage of the distilled spirits of his own manufacture until the tax thereon has been paid. Such a warehouse is under the direction and control of the collector of the district and in charge of an internal revenue storekeeper and is declared by the law "to be a bonded warehouse of the United States to be known as a distillery warehouse." Section 3271 (U. S. Comp. St. 1901, p. 2122).

Under the act of the Legislature of Maryland, approved February 27, 1906, being chapter 19 of the Acts of 1906, entitled "An act to add a new section to article 14 of the Public General Laws, 1904, title 'Bills of Lading, Storage and Elevator Receipts' to come in after section 11 of said article, and be called section 12," it was enacted as follows:

"Sec. 12. Bonded warehouses of the United States, known as distillery warehouses, as defined by and existing under the laws of the United States of America and situated in this state, shall be deemed to be warehouses within the contemplation and meaning of this act, and such distillery warehouses shall be subject to all the provisions of this article not inconsistent with the laws of the United States regulating the conduct and operation of such distillery warehouses, and all warehouse receipts hereafter issued by such a distillery warehouse shall be governed by and subject to all the provisions of this article as fully to all intents and purposes as the warehouse receipts of any other warehouseman, corporation or person conducting a general warehousing business in this state."

This state statute became effective on June 1, 1906, and was in force as to all warehouse certificates issued after that date, and there are but few involved in this case issued prior to that date.

It is urged by the exceptants that, by reason of the subject not being described in its title as required by the Constitution of Maryland (section 29, art. 3), this act of the Maryland Legislature is void. The constitutional law of Maryland is what its Court of Appeals declares it to be, and the Court of Appeals of Maryland has distinctly held that ordinarily it is a sufficient compliance with the constitutional requirement if the title of the act states its purpose to be to add an additional section to an article of the Code and mentions the numbers of the

article and section. Kingan Packing Association v. Lloyd, 110 Md. 619–625, 73 Atl. 887; Garrison v. Hill, 81 Md. 554, 32 Atl. 191; Himmel v. Eichengreen, 107 Md. 613, 69 Atl. 511; Second German American Building Association v. Newman, 50 Md. 62–65.

By the Maryland Code all warehouse, elevator, or storage receipts whatsoever for goods deposited are declared to be negotiable instruments, and full and complete title to the property therein mentioned shall vest in the bona fide holder for value.

But independent of the special enactment of Maryland with regard to distillery warehouses, I am in full accord with the special master in his conclusion that, because of the peculiar situation of the distilled spirits stored in a bonded distillery warehouse, there is by the transfer effected by the warehouse certificate as full a delivery of the goods as is commercially possible under the special circumstances attending distilled spirits stored in the bonded distillery warehouses of the United States.

I will not prolong this opinion by a recital of those circumstances or of the reasons why a constructive delivery should result from the issuing of such warehouse certificates. It will be sufficient to refer to the very able discussion of the question in the opinion of the special master returned to the court in this case, and to the learned and convincing opinion of Circuit Judge Gray in the Circuit Court of Appeals for the Third Circuit in Taney v. Pennsylvania National Bank of Reading, 187 Fed. 689, 109 C. C. A. 437.

It appears that this constructive delivery is commonly made use of by those dealing in whisky, and money is loaned on pledges of the certificates by banks and others in sums of great magnitude. This is so because whisky usually must be kept in the distillery warehouse five years to mature, and in no other way could the necessary money be raised and the whisky itself be commercially dealt with except by the use of these warehouse certificates representing the whisky.

The rules of commercial law are built up upon the actual dealings which have the sanction of honest and competent merchants and which are necessary to carry out honest transactions in the fairest manner.

The Maryland Court of Appeals in several cases involving the proper taxation of whisky stored in distillery warehouses has recognized the holder of the warehouse certificate as the owner of the whisky. Monticello Distillery Co. v. Baltimore City, 90 Md. 416, 45 Atl. 210; Fowble v. Kemp, 92 Md. 637, 48 Atl. 379; Carstairs v. Cochran, 95 Md. 488, 52 Atl. 601: Carstairs v. Cochran, 193 U. S. 10, 24 Sup. Ct. 318, 48 L. R. A. 596; Hannis Distilling Co. v. Baltimore, 216 U. S. 285, 30 Sup. Ct. 326, 54 L. Ed. 482.

I overrule the exceptions based upon the supposed invalidity of the certificates, and I confirm the master's report upholding their validity.

[2] A contention relied upon by certain exceptants is that as some of the loans were to Gambrill himself, and as he signed the pledged certificates as president of the Distilling Company, the parties taking the certificates in pledge had notice that Gambrill was pledging the Distilling Company's property for his individual debt, and therefore the pledge was invalid.

The special master held against this contention upon the grounds: First, that prior to June 19, 1906, all the whisky was in fact Gambrill's, and a certificate issued to him prior to that date truly represented the actual ownership; second, that as to all certificates issued after June 1, 1906, when the Maryland act went into effect making distillery warehouses and their receipts subject to the provisions of the Code, the certificates by virtue of the Code vested a complete title in the holder unaffected by any equities, and was conclusive evidence that the goods had been actually received and were in custody.

It appears to me that there is also another ground upon which the holders of this class of pledges have good title to their certificates, which is that when Gambrill in 1906 transferred all his whisky to the Distilling Company, Gambrill was bound to pay whatever loans he had individually secured by pledging it, and that in renewing these loans, or in effecting new loans to take up the old ones, the whisky was only pledged to carry subsisting liens on it, and the loans operated as well to benefit the company as to benefit Gambrill.

Moreover, it is to be borne in mind as to all transactions that in point of fact Gambrill was the company. He owned substantially all the stock, managed all its business and operations, and conducted all its financial transactions. His authority was never called in question, and he continued so to act during years of time, so that his method of conducting the business must be taken as assented to by those who might have controlled him if they saw fit to do so. In some cases his methods were formally authorized.

I agree with the special master that there is no sufficient ground to hold that any of the pledges to secure loans to Gambrill are invalid.

[3] In a number of instances certificates of an earlier date were for convenience surrendered in order to divide up into smaller lots the number of barrels called for by a certificate or to obtain a certificate in the name of a purchaser of the whole or a part of the barrels enumerated in the old certificate. In these cases, in order to determine the rights of the holders of such substituted certificates, the special master has taken the date of the original certificate as the date controlling the rights of the holders. I affirm the special master's ruling.

This becomes of great importance because a disgraceful feature of the insolvency of this company is that under Gambrill's management certificates calling for barrels by their serial numbers were repeatedly issued, when certificates for the same barrels were already outstanding in the hands of bona fide innocent holders who had advanced money on them. There were, at the date of the appointment of the receivers, receipts outstanding for 35,479 packages, while there were actually in the warehouses 17,825 barrels and 1,301 half barrels, making 19,126 packages.

The special master has treated the older certificates, or the certificates substituted for the older ones, as having the first lien on the barrels called for, and those holding the subsequent certificates for the same barrels (unless taken in substitution for an older certificate) as coming next in priority.

In this I think the special master was plainly correct, and I overrule all exceptions based on the contrary view.  I am also in accord with the views expressed in the special master's opinion and report as to marshaling of the securities held by senior and junior pledgees.

[4] A petition has been filed by the county commissioners of Washington county asking the payment as a preferred claim with a lien on the whisky which came to the hands of the receivers of a balance of taxes for the years 1907, 1908, 1909, and 1910, amounting to $2,801.36.

The receivers paid the county tax on all the whisky which came to their hands, but they contest their liability for tax on whisky which they never had.

The county tax on distilled spirits is imposed by a special statute of Maryland.  Act of 1892, c. 704 (Code, art. 81, § 214 et seq.).

It is required that the distiller shall report for taxation the quantity of distilled spirits on hand on the 1st of January in each year, and shall make quarterly reports showing the deliveries, and shall remit and pay with each report the tax on such distilled spirits, and shall not permit the distilled spirits to go from the warehouse without paying the tax, and any warehouseman, custodian, or agent paying such tax shall have a lien on the distilled spirits covered by such tax.

The Maryland Court of Appeals, in Fowble v. Kemp, 92 Md. 630–638, 48 Atl. 379, 382, construing this act taxing distilled spirits on storage, said:

"The liability of the appellees to pay the tax due by other owners of the distilled spirits is a liability unlike that which they are under to pay taxes on the spirits which they own.  In the one case their liability is that of a collector for the state; in the other, it is that of owner.  An owner of property holds it subject to the right of the state to seize it upon summary process for the nonpayment of taxes.  As collector for the state the same person is not liable to have his own property seized under the same process for the nonpayment of taxes not actually due by him at all.  This has been expressly ruled in Hull v. Southern Dev. Co., 89 Md. 8 [42 Atl. 943].  *  *  * So far, then, as the appellant undertook by distraining property owned by the appellees to enforce the payment of the taxes due by other owners of the distilled spirits though the taxes were payable by the appellees under the statutory obligation, the proceeding was unwarranted.  The appellant should have brought suit in a court of law upon the statutory obligation, and when a judgment was recovered execution could be issued, and any property owned by the appellees could be levied on and sold."

It would seem clear in this case that the Distilling Company was liable for having allowed the whisky to be taken away without collecting and paying over the tax, but that there was no lien on the whisky belonging to others which remained on storage.  It is true there were in this case some barrels which had been overlooked and certificates for which had not been sold or pledged, and the receivers have paid the county tax on that whisky, but the proceeds of that whisky were absorbed in the expenses of the receivership and cannot be used to pay the taxes on other whisky.

As for the claim of the state of West Virginia for a license tax, I am also of opinion that cannot be held to be a lien on the property of others held in storage by the Distilling Company.

[5] Another contention arises over the claim of the North Vernon

National Bank of Indiana for the payment of costs and attorney's fees on a promissory note given by the Distilling Company, secured by pledge of whisky which has been sold by the receivers for more than sufficient to pay the debt and interest.

The stipulation contained in the note is that upon default the holder may sell the collateral at any broker's board, or at public or private sale, and after the proceeds of any sale have been applied to the payment of the note, and after charging all costs and attorney's fees, any excess to be paid to the maker of the note.

The language of the stipulation that the holder of the note may sell the collateral and that the proceeds of any sale may be applied to the payment of costs and attorney's fees I think contemplates a sale by the holder of the note. In this case the collateral was sold by the receivers appointed by the court, and not by or at the expense of the holder of the note. All the holder of the note has to do is to prove his claim and receive payment. I agree with the special master in disallowing attorney's fees and costs.

I have not considered it necessary in passing on the exceptions to say more, as the able and learned opinion and report of the special master have discussed all the points raised by the exceptants in the most careful and thorough manner, with full citation of authorities, and I am in full accord with the results he has reached.

I therefore overrule the exceptions and will sign a decree to carry the report into effect.