### WESTCOTT HOSIERY MILLS v. RICH'S, Inc., et al.

### SAME v. J. REGENSTEIN CO. et al.

### Nos. 584, 585.

District Court, N. D. Georgia, Atlanta Division. Feb. 13, 1932.

Robert C. Alston, of Atlanta, Ga., Charles Neave, Hubert Howson, and H. A. Howson, all of New York City, and J. A. McFarland, of Dalton, Ga., for plaintiff.

Hugh M. Morris, of Wilmington, Del., Wallace White, of New York City, Justin L. Fearing, of Wilmington, Del., and Marion Smith, of Atlanta, Ga., for defendants.

UNDERWOOD, District Judge.

The issues and the law in these cases are substantially the same, and, by agreement of the parties, the cases were tried together.

The suits are founded on alleged infringements by defendants of United States letters patent No. 1,759,561, granted to David H. Young, assignor to plaintiff, on May 20, 1930, for a knitted fabric and a knitted stocking composed of lustrous counter-twisted yarn. Defendants Rich's, Inc., and J. Regenstein Company are sued as retail dealers in the alleged infringing articles, and defendants Julius Kayser & Co., Inc., and J. R. Beaton Co., Inc., as manufacturers of same. Julius Kayser & Co., Inc., was not served and did not appear.

The defendants who appear in the suits admit infringement, if the patent is valid, but deny its validity for want of both novelty and invention. The only issue presented, therefore, is the validity of the patent.

From an examination of the file wrapper and contents of the patent showing its progress through the Patent Office, it appears that this case was, at applicant's request, made special and rapidly passed to allowance. The application was filed January 9, 1930, and the Examiner, on April 16, 1930, rejected the claims as devoid of invention, citing as references the Burson, 1902, and Dreyfus, 1925, patents, and the books of Caplin and Seem. In response to the finding of the Examiner, amendments and arguments were filed by applicant April 21, 1930, and on April 23, 1930, the patent was allowed, without further record of objections or references. The various claims of the patent, seven in all, are for a "knitted fabric," broadly, and a "knitted stocking," as a new product. Some of these claims are broader than others, and some refer to knitted fabrics and others to knitted stockings. The patent itself recites that the "invention relates to knitted fabrics and more particularly to the nature of the yarn used."

Plaintiff stated that the claims relating to knitted fabrics need not be considered, as the alleged infringing articles are knitted stockings, and also that a finding upholding the validity of claim 3 would be all that is necessary, as this claim is typical of those relating to knitted stockings, and the alleged infringing articles come within its defined limits. This claim is in the following language: "A knitted stocking containing a silk yarn composed of a plurality of threads, each thread having been given a twist in one direction in the first time spinning and the final yarn having been given a lower twist in the opposite direction, said individual threads having been given a twist of the order of 32 to 48 turns per inch and said yarn a twist of the order of 28 to 44 turns per inch."

The issue may therefore be stated in the language used in plaintiff's brief, as follows: "Whether or not it was new and involved invention to make a knitted stocking of silk yarn having twists in the single threads within defined limits and a counter-twist in the doubled strands within defined limits—the limits being of the order of 28 to 48 turns per inch."

Under the federal statutes a patent ordinarily must be useful, and new in the sense that its novelty must amount to invention or discovery. Thompson v. Boisselier, 114 U. S. 1, 5 S. Ct. 1042, 29 L. Ed. 76.

I think the evidence in this case shows that the knitted stockings made in the manner described in claim 3 of the patent were useful. There is no doubt but that such stockings quickly became popular and had a wide sale both by patentees and their licensees and imitators, so that the requirement of law with respect to usefulness has been met.

I pass then to a consideration of the question of the novelty of the patent. Was the article new in the sense of the statute, in the sense that it amounted to an invention or discovery?

This question must be answered in the light of the state of the art, and whatever was

previously known through patents, publications, or actual practice of the art must be considered, whether the patentee had knowledge of them or not. Derby v. Thompson, 146 U. S. 476, 13 S. Ct. 181, 36 L. Ed. 1051; Daylight Glass Mfg. Co. v. American Prismatic Light Co. (C. C. A.) 142 F. 454; Fry v. Rookwood Pottery Co. (C. C.) 90 F. 494.

In this case the state of the art was shown to negative patentable novelty, unless the use in the manufacture of stockings of silk yarn, twisted as described in the patent, was such.

The evidence shows and plaintiff concedes that counter-twisted silk yarn, twisted and counter-twisted between the limits described in the patent, were known previously in weaving, and plaintiff frankly concedes that it does not claim that the yarn as such was novel and previously unknown, but does claim that such yarn, within the orders of twists described in the patent, was novel and unknown, before this patent, in knitting stockings.

The record shows, however, that it had been previously used for knitting silk neckties and sweaters (Caplin, 1927, p. 27, Defendants' Exhibit C; Seem, Record, p. 134), and, at least in the lower twists, for knitting silk stockings (Weil and Raimon patents, Defendants' Exhibits N and O, and Ditton, Record, p. 147); and that lisle thread, which is made of cotton instead of silk high counter-twisted yarn, was used in knitting cotton stockings.

Mr. Young himself admits that double-twisted silk yarns within the orders and twists claimed in the patent were well known to the art and to him, and was known to the trade as grenadine or hard-twisted organzine.

In a letter to Mr. Westcott, dictated by Mr. Young in July, 1929 (Defendants' Exhibit V) he says that he had known of grenadine for over twenty-five years, and cautioned Mr. Westcott to "not at the start use either the name of voile or grenadine in connection with any new name you might use," for "old timers of yard goods might be able to put two and two together if you use the technical names."

Grenadine was defined by the trade as a counter-twisted silk yarn with orders of twists varying according to different authorities between the following limits: 28–18 to 60–60 (Kline, 1926, Defendants' Exhibit D, p. 140; Silk Throwsters' Price List, 1911, Defendants' Exhibit B: Cheney Bros. Glossary, 1915, p. 38, Defendants' Exhibit E), 50 to 70 (Seem, 1922, p. 180), 38 to 40 (Reh, 1916, Defendants' Exhibit A, p. 25), and 16 to 70 as claimed by plaintiff.

The record further shows that grenadine was not only well known to the art, but was commonly sold as a commodity on the open market, as shown by the Throwsters' price list.

Not only was the yarn, as such, in the orders of twists included in the patent, well known and generally used long prior to the patent, but all of the qualities of such yarn claimed in the patent were likewise well known, as were also the effects derived from weaving and knitting the yarn.

For example, it was generally known in the art that twisting increased the strength and reduced the luster, and that the strength and degree of luster resulted merely from the number of twists given the yarn (Record, p. 170; Caplin, pp. 10, 26, 27, 31, Defendants' Exhibit C); that the higher the twist the harder the feel and the greater the sheerness (Defendants' Exhibit J, p. 86, 1919; Defendants' Exhibit K, p. 8; Defendants' Exhibit M, p. 194); and that the appearance, utility, finish, sheerness, handle, strength, and wearing qualities of the yarn and the finished product are affected by the number of twists given the yarn (Defendants' Exhibit I, p. 113, 1918). The Raimon patent (Defendants' Exhibit O) points out specifically that this yarn may be used in knitting hosiery, and that its use produces "special properties, a particular feel and a characteristic appearance," and a fabric that can be degummed, dyed, and finished in piece form after manufacture, and one "characterized by its appearance, its feel and extensibility."

Now the claims made in the patent for "the fabric resulting from the use of this novel knitting yarn" are: That it is stronger and characterized by reduced luster, is a more uniform and flatter fabric with less apparent wales and more transparency, is not sleazy, has greater elasticity with resultant better adjustment to the leg, has a more pleasant feel, is less liable to start a run, has better dyeing qualities, and is characterized by lessened prominence of water spots.

It will be seen, therefore, that every substantial claim made by the plaintiff for the yarn and fabric in question was already known to the art long prior to the issuance of the patent.

The plaintiff maintains, however, that no stockings were ever knitted within the particular twists described in the patent prior to Young's patent, and that his were, therefore,

pioneers in fabrics having the characteristics claimed.

But Mr. Young himself admits that the selection of the range of twists claimed in his patent was arrived at merely by experimentation, within the recognized limits of the old grenadine yarn, and that the limits chosen were determined by the merchantability of the product, and that the effects secured by varying the number of twists differed only in degree from one step to another. Record pp. 170, 171.

Much has been said in this case of the success of the fabric when put upon the market and of the extravagant puffing in the advertisements of the defendants, but these things, though significant, are not conclusive and cannot connote invention if it does not exist.

It is true that just before the appearance of plaintiff's stocking there was a wide demand for dull stockings, that girls were wearing their stockings wrong side out to get this effect, and the manufacturers were experimenting to find a way to meet this new demand, the demand theretofore having been for lustrous stockings. Mr. Young experimented with different twists of grenadine while other manufacturers sought to secure the same effect by cheaper means. Mr. Ditton, who was then in charge of the research department of Gotham Silk Hosiery Company, testified that he knew from experience that he could accomplish the dull effect in stockings by using high twist yarns, but that he preferred to devote his time to accomplishing this result in a more economical way, which was by chemical means, since grenadine stockings cost about three times as much as tram stockings, because they are more expensive to knit and require more silk. Record pp. 144 and 150. The Young stocking caught the public fancy, and it seems that most of the leading manufacturers had to follow his lead, though it cost more to produce the fabric.

The success of the product may have been due to the timeliness of its marketing and judicious advertising, or to an excellence falling short of invention. Bobbed hair, short skirts, and bare legs, at about the same time, seem to have reached almost as great popularity as plaintiff's stockings, yet I am sure we will not attribute patentable novelty to these ideas.

While plaintiff's fabric was useful and excellent, it seems to me to fall short of patentable novelty, and I do not think that plaintiff has a right to monopolize, for use in knitted fabrics, the greater part of the range of twists of a silk yarn which had been known and used for more than a quarter of a century.

No claim is made for a novel yarn, nor a process, but only for a product. No specifications of method of knitting are necessary to produce the product, nor a new machine or new adjustment to fabricate it. The ordinary knitting machines, operated in the usual way, are sufficient. The only instructions required are: "Feed an old yarn, which you can purchase in the open market, to the needles in the knitting machine in the usual way." Plaintiff's patent.

Just as much was said in the Raimon patent, which states that "this fabric is obtained by the novel use of crepe or grenadine silk thread on a hosiery machine." The only difference is that Young gives approximately the number of twists, while Raimon merely used the name, grenadine, which imports the number of twists. Both recognize the wide range in the number of twists in the yarn to be used. Young says in his patent: "I prefer to make the yarn twists from 28 to 44 turns per inch. Here again the limits are elastic." On the stand he stated that he began his experiments with low-twist organzine of 12–10 turns, and worked from that up to 60–60 turns; that he finally selected 28 turns as the lower limit because at that point he got the effect he was after and found that less turns did not warrant the extra cost since the resulting fabric had both luster and a grained effect: that he chose 48 turns as the upper limit because the result of using a twist above this number was a very dull effect and "impracticable for commercial use on account of the difficulty in knitting." Record p. 162. He further testified that difference in the orders or twists was merely a matter of degree determined by the marketability of the product. Record pp. 170, 171.

It will be seen, therefore, that in both patents it is intended that the number of twists should be determined by the effects desired, Young undertaking to indicate the limits of merchantability and practicability, while Raimon left the whole range of grenadine twists to the judgment of the manufacturer.

In its last analysis the case resolves itself into this question, Is it invention, for which the monopoly of a patent should be granted, to discover by experimentation that feeding "to the needles in a knitting machine in the usual manner" a counter-twisted silk yarn, well known to the art and to the discoverer, will give effects in the resulting

fabric characteristic of the yarn used, which characteristics were already well known to the art of weaving and knitting and inherent in the yarn itself?

My answer is no. In answering thus I am not unmindful of the case of O. K. Jelks v. Tom Huston Peanut Co. (C. C. A.) 52 F.(2d) 4, which I think marks the outermost bounds of invention and which I do not believe will be further extended. That case was more substantial than this one, and to uphold this patent one must go beyond the liberal limits of patentability there marked out.

In the case of Miller v. Swartz (C. C. A.) 52 F.(2d) 542, 543, the court, apparently with much hesitation, upheld the patent, but with strict limitations which the court say "are not merely restrictive of the invention but, oddly enough, are essential to a disclosure of the invention, which is one way of doing just one new thing, namely; to get a twisted yarn effect without using twisted yarn." The court further say that the inventor "did something more than obtain a happy result from a common practice." In the case at bar Young obtained happy effects but from a common and well-known method of producing them.

The cases of American Stainless Steel Co. v. Ludlum Steel Co. (C. C. A.) 190 F. 103, and General Electric Co. v. Hoskins Mfg. Co. (C. C. A.) 224 F. 464, are not as close as the Jelks and Miller Cases and are even more readily distinguished from the case at bar.

Industry and genius should be rewarded, but the public should also be protected and not excluded from the right to use old and well-known commodities and improvements arising from the progressive development of industry, unless such improvement arises to the dignity of invention or discovery.

I am of opinion, upon the facts above found, that plaintiff's patent is invalid for want of novelty and invention, and that the bills of complaint in both suits should be dismissed. Decrees are being entered in accordance with this opinion.